# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEITH MOULTON, Derivatively on Behalf of Nominal Defendant CPI AEROSTRUCTURES, INC., <br><br> Plaintiff, <br><br> v. <br><br> DOUGLAS MCCROSSON, VINCENT PALAZZOLO, TERRY STINSON, CAREY E. BOND, JANET K. COOPER, MICHAEL FABER, WALTER PAULICK, ERIC ROSENFELD, HARVEY J. BAZAAR, <br><br> Defendants, <br><br> and <br><br> CPI AEROSTRUCTURES, INC., <br><br> Nominal Defendant. | Case No. 1:20-CV-02092-AMD-RML <br><br><br> **<u>VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT</u>** |

**TABLE OF CONTENTS**

I.      NATURE AND SUMMARY OF THE ACTION ............................................................1

II.     JURISDICTION AND VENUE ................................................................................4

III.    PARTIES ...........................................................................................................5

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS ........................................................6

        A.      Fiduciary Duties................................................................................6

        B.      Audit & Finance Committee Charter ...................................................8

        C.      Compensation & HR Committee Charter .............................................9

V.      SUBSTANTIVE ALLEGATIONS ...........................................................................9

        A.      Company Overview ...........................................................................9

        B.      Relevant Accounting Principles..........................................................9

        C.      The Individual Defendants Issue False and Misleading Statements....................11

        D.      A Red Flag Waves While the Individual Defendants Continue to Issue
                Materially Misleading Statements .........................................................20

        E.      The Truth Fully Emerges ...................................................................33

                1.      CPI Discloses That It Incorrectly Applied ASC 606 ................................33

                2.      CPI Restates its Financial Statements for Seven Consecutive
                        Quarters......................................................................................35

                3.      The SEC Commences an Investigation......................................................46

        F.      The Errors in the Financial Statements Caused Harm to CPI................................46

                1.      Executive Officers Received Excessive Compensation on the Basis
                        of False Financial Statements ....................................................46

                2.      Amendment to BankUnited Credit Facility .................................49

VI.     DAMAGES TO THE COMPANY..........................................................................51

VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .......................................52

A.     Demand is Excused Because There is Reason to Doubt a Majority of the Board Acted in Good Faith ................................................................................................53

    1.     A Majority of the Board Knew of ASC 606 and the Need for Internal Controls Related to it Since 2014 .............................................................53

    2.     A Red Flag is Waved Before McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond ............................................................................... 56

    3.     McCrosson is Not Disinterested ..........................................................59

    4.     Reason Exists to Doubt the Audit Committee Members Acted in Good Faith .............................................................................................59

COUNT I .................................................................................................................64

COUNT II ................................................................................................................65

COUNT III ...............................................................................................................66

COUNT IV ...............................................................................................................67

PRAYER FOR RELIEF ...........................................................................................68

JURY DEMAND ......................................................................................................69

Plaintiff Keith Moulton ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, CPI Aerostructures, Inc. ("CPI" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, Contribution for Violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), and unjust enrichment.  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by CPI with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    CPI supplies aircraft parts for fixed wing aircraft and helicopters in commercial and defense markets.  The Company is a prime contractor to the U.S. Department of Defense. CPI also provides engineering, supply chain management, and maintenance, repair and overhaul services.

2.    In January 2018, the Company adopted a new accounting standard governing revenue from customer contracts called Accounting Standards Codification ("ASC") Topic 606 ("ASC 606").  The standard was introduced by the Financial Accounting Standards Board in 2014. CPI had four years to implement the standard and disclose its impact.  In each of the Company's Forms 10-K for the fiscal years from 2014 to adoption of ASC 606 in 2018, management assured investors that the Company was preparing to adopt the standard and was evaluating its impact on CPI's revenue recognition practices.  Once the standard became effective in 2018, CPI's reports filed with the SEC told investors that, "[f]ollowing the adoption of [ASC] Topic 606, the

Company's revenue recognition for all of its contracts remained materially consistent with historical practice."

3.     However, notwithstanding their public disclosures the Company's executive officers and directors failed to ensure that CPI implemented ASC 606 and failed to ensure that CPI had meaningful internal controls over revenue recognition.

4.     CPI purportedly adopted ASC 606 in the first quarter of 2018.  Shortly thereafter, the Board was presented with a red flag alerting it to deficient internal controls over revenue recognition.  In February 2019, the Company was forced to restate its financial results for the first nine months and third quarter of 2018 due to a material weakness in its internal controls related to revenue recognition that caused an "error . . . in the Company's billing process," resulting in the overstatement of revenue by more than $900,000.  However, the Board told investors that the revenue reporting error was due to discreet internal control deficiency and that the issue was promptly remediated.

5.     Then, on February 14, 2020, CPI revealed that its financial statements for the past seven quarters "should no longer be relied upon due to an error in those financial statements relating to the Company's recognition of revenue from contracts with customers under ASC Topic 606."  As a result, key financial results were overstated, including revenue, net income, and contract assets.

6.     On August 25, 2020, CPI filed its restated financial statements for the periods since January 1, 2018 (the "Restatement"), reflecting that the Company actually incurred net losses for eight consecutive periods, rather than net income as it had previously reported.  The magnitude of the Restatement is staggering—for the 2018 fiscal year, revenue had been overstated by *19%*, gross profit had been overstated by *331%*, and its contract assets had been overstated by *544%*.

Additionally, rather than retained earnings of approximately $22.7 million, CPI had an accumulated **a deficit of $74,596,536** as of December 31, 2018.  Evident from the scale of the restatement is that the Company lacked meaningful controls over revenue recognition to such a degree that its financial results had wildly mispresented its financial condition and revenue for nearly two years.

7.      In the Restatement, CPI also admitted to broad material weaknesses in its revenue recognition accounting controls, including that the Company "lacked procedures for ensuring the period of performance or value of the accounting contract were properly determined," *i.e.* a critical step of ASC Topic 606.  The Company also stated that "***no controls exist[ed]***" to account for significant, non-routine, complex transactions.

8.      These revelations precipitated the filing of a securities class action in this District against CPI and certain of the defendants named herein, captioned *Rodriguez v. CPI Aerostructures, Inc., et al.*, Case No. 1:20-cv-00982 (the "Securities Class Action"), alleging violations of the Securities Act of 1933 and the Securities Exchange Act of 1934.

9.      The foregoing misconduct caused CPI significant harm.  In addition to an ongoing SEC investigation into the Company's financial statements, the errors in the financial statements caused CPI to be in violation of certain covenants with respect to a credit facility.  In connection with the Restatement, the Company was forced to amend the terms of its credit agreement under which $6 million was converted from a revolving loan to a term loan and a higher interest rate applies to the repayment of its loans.

10.      Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  The Board is currently composed of seven members, all of whom are named in this

action.  Five of the seven current directors were on the Board since 2015 and knew for years that the change to ASC 606 was coming and the Company required functioning internal controls over revenue recognition in order to transition to the new standard.  They also issued years worth of disclosures telling investors that they were evaluating the impact of ASC 606 on the Company's revenue recognition practices, and, once adopted, repeatedly – and falsely – told investors that under ASC 606, CPI's revenue recognition practices were consistent with its historical practice.  Further, as alleged herein, McCrosson as CEO received cash bonuses based on CPI's purported achievement of certain growth targets, including revenue and pre-tax income, in fiscal 2018 when in reality the Company incurred a pre-tax loss for the period.  Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act of 1934.

12.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(l) because complete diversity exists between plaintiffs and each defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

13.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

### III.    PARTIES

**Plaintiff**

15.    Plaintiff Keith Moulton purchased 2,200 shares of CPI stock in December 2017 and has continuously owned his CPI stock since that date.  He is a resident of New Jersey.

**Nominal Defendant**

16.    Nominal Defendant CPI is a New York corporation with its principal executive offices located at 91 Heartland Blvd., Edgewood, NY 11717.  The Company stock trades on the New York Stock Exchange ("NYSE") under the symbol "CVU."

**Defendants**

17.    Defendant Douglas McCrosson ("McCrosson") has served as the Chief Executive Officer ("CEO"), President, and a director of the Company since March 2014.  McCrosson is a defendant in the Securities Class Action.  He is a resident of New York.

18.    Defendant Vincent Palazzolo ("Palazzolo") served as Chief Financial Officer from May 2004 to November 2019.  Palazzolo is a defendant in the Securities Class Action.  He is a resident of New York.

19.    Defendant Terry Stinson ("Stinson") has served as Chairman of the Board since June 2014.  He is a member of the Compensation & HR Committee, and was the Chair of the Compensation Committee from June 2014 to June 2019.  He is a resident of Texas and/or Florida.

20.    Defendant Carey E. Bond ("Bond") has served as a director of the Company since December 2016.  He has been the Chair of the Compensation & HR Committee since June 2019, and he served as a member of the Compensation Committee at all relevant times.  He is a resident of Florida.

21.    Defendant Janet K. Cooper ("Cooper") has served as a director of the Company since April 2019.  She is Chair of the Audit & Finance Committee.  She is a resident of Texas.

22.     Defendant Michael Faber ("Faber") has served as a director of the Company since August 2013.  He is a member of the Audit & Finance Committee.  He is a resident of Washington, D.C.

23.     Defendant Walter Paulick ("Paulick") has served as a director of the Company since April 1992.  He is a member of the Audit & Finance Committee.  He is a resident of New York.

24.     Defendant Eric Rosenfeld ("Rosenfeld") has served as a director of the Company since 2003.  He is a member of the Compensation & HR Committee.  He is a resident of New York.

25.     Defendant Harvey J. Bazaar ("Bazaar") served as a director of the Company from 2006 to June 2019.  He is a resident of Florida.

26.     The defendants named in ¶¶ 17-25 are sometimes referred to hereinafter as the "Individual Defendants."

**Relevant Non-Parties**

27.     Dan Azmon ("Azmon") served as Chief Financial Officer from November 13, 2019 to February 2020.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

28.     By reason of their positions as officers, directors, and/or fiduciaries of CPI and because of their ability to control the business and corporate affairs of CPI, at all relevant times, the Individual Defendants owed CPI and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage CPI in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of CPI and its shareholders so as to benefit all shareholders equally

and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to CPI and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CPI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with CPI, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

30.     To discharge their duties, the officers and directors of CPI were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of CPI were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.**     **Audit & Finance Committee Charter**

31.     The Audit & Finance Committee Charter provides that its members must "monitor[] (1) the integrity of the annual, quarterly and other financial statements of the Company, (2) the independent registered public accounting firm's qualifications and independence, (3) the performance of the Company's independent registered public accounting firm and (4) the compliance by the Company with legal and regulatory requirements."

32.     According to the charter, the members of the Audit & Finance Committee must, among other things:

1. Meet with the independent registered public accounting firm prior to the audit to review the scope, planning and staffing of the audit.

2. Review and discuss with management and the independent registered public accounting firm the annual audited financial statements, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

3. Review and discuss with management and the independent registered public accounting firm the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent registered public accounting firm's review of the quarterly financial statements.

4. Discuss with management and the independent registered public accounting firm, as appropriate, significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including:

    (a) any significant changes in the Company's selection or application of accounting principles;

    (b) the Company's critical accounting policies and practices;

    (c) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm;

    (d) any material written communications between the independent registered public accounting firm and management, such as any management letter or schedule of unadjusted differences; and

(e) any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

*     *     *

9. Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for the Company's Form 10-K and Form 10-Q about any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

### C.     Compensation & HR Committee Charter

33.     The Compensation & HR Committee is tasked with, among other things, approving executive compensation for named executive officers ("NEOs") based on their achievement of corporate goals.  Specifically, the charter for the committee provides that its members must:

> Review and approve annual corporate goals and objectives relevant to NEO compensation; evaluate NEO performance in light of those goals and objectives; and recommend for approval by the independent members of the Board the NEO compensation level based on this evaluation. In evaluating and determining NEO compensation, the Committee shall consider the results of the most recent stockholder advisory vote on executive compensation required by Section 14A of the Exchange Act. The Committee may also consider, among other factors, the Company's performance and relative stockholder return, the value of incentive awards made to executive officers at comparable companies, the awards granted to the NEOs in prior years, the terms of any employment agreement, change in control agreement, or other agreement relating to compensation to be paid to the NEO, the economic environment, and general market conditions.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Company Overview

34.     CPI supplies aircraft parts for fixed wing aircraft and helicopters in commercial and defense markets.  The Company is a prime contractor to the U.S. Department of Defense. CPI also provides engineering, supply chain management, and maintenance, repair and overhaul services.

### B.     Relevant Accounting Principles

35.     ASC 606, Revenue from Contracts with Customers was introduced by the Financial Accounting Standards Board ("FASB") in 2014 to improve the financial reporting of revenue and

9

allow top line financial statements to be compared.  As the FASB stated, "[t]he core principle of the new standard is for companies to recognize revenue to depict the transfer of goods or services to customers in amounts that reflect the consideration (that is, payment) to which the company expects to be entitled in exchange for those goods or services."

36.     ASC Topic 606 establishes a five-step process that entities must apply to recognize revenue:

Step 1: Identify the contract with the customer.

Step 2: Identify the performance obligations in the contract.

Step 3: Determine the transaction price.

Step 4: Allocate the transaction price to the performance obligations in the contract.

Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation.

37.     The "performance obligations" of the second step are the contractual promises to transfer a good or service to the customer.  Performance obligations are the unit of accounting that form the basis for how and when revenue is recognized.  To identify the performance obligations, ASC Topic 606-10-25-14 provides that:

At contract inception, an entity shall assess the goods or services promised in a contract with a customer and shall identify as a performance obligation each promise to transfer to the customer which is either:

a. A good or service (or a bundle of goods or services) that is distinct; or

b. A series of distinct goods or services that are substantially the same and that have the same pattern of transfer to the customer[.]

38.     CPI was required to evaluate and disclose the impact ASC Topic 606 would have on its future financial statements prior to its adoption.  *See* SEC Staff Accounting Bulletin Topic 11M, *Disclosure Of The Impact That Recently Issued Accounting Standards Will Have On The Financial Statements Of The Registrant When Adopted In A Future Period*.  Moreover, public

companies could delay implementing ASC Topic 606 until the annual period beginning after December 31, 2017, *i.e.* four years after the guidance was first issued.

### C. The Individual Defendants Issue False and Misleading Statements

*The 2017 10-K*

39.     On March 22, 2018, defendants McCrosson, Palazzolo, Stinson, Bond, Faber, Paulick, Rosenfeld, and Bazaar signed and caused CPI to file its annual report on Form 10-K with the SEC for the period ended December 31, 2017 (the "2017 10-K"), which described the Company's revenue recognition policy:[1]

> Effective January 1, 2018, the Company adopted Topic 606 using the modified retrospective method for all of its contracts. ***Following the adoption of Topic 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice.*** In addition, following the adoption of Topic 606, the Company will change the presentation of its balance sheet moving its costs and estimated earnings in excess of billings on uncompleted contracts to contract assets and its billings in excess of costs and estimated earnings to contract liabilities.

40.     The above statements in ¶ 39 were materially misleading because they failed to disclose: (i) that the "use of a manufacturing program" was used as the unit of accounting in CPI's historical revenue recognition policy; (ii) that CPI's revenue recognition policy did not use performance obligations as the unit of accounting, as required by ASC Topic 606; (iii) that adoption of ASC Topic 606 required a material change in CPI's revenue recognition policy; and (iv) that there was a material weakness in CPI's internal control over financial reporting due to the failure to properly adopt ASC Topic 606.

*First Quarter 2018*

---

[1] Unless otherwise stated, all emphasis in bold and italics is added.

41.     On May 15, 2018, defendants McCrosson, Palazzolo, Stinson, Bond, Faber, Paulick, Rosenfeld, and Bazaar caused CPI to announce its first quarter 2018 financial results in a press release, which stated, in relevant part:

> **Note**: Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 Revenue from Contracts with Customers ("ASC 606") using the modified retrospective method. Revenue recognition on all of the Company's contracts did not change materially as a result of the adoption of ASC 606.
>
> **First Quarter 2018 vs. First Quarter 2017**
>
> - Revenue of $18.2 million compared to $20.0 million;
> - Gross profit of $4.0 million compared to $4.5 million;
> - Pre-tax income of $1.6 million compared to $2.0 million;
> - Net income of $1.3 million compared to $1.2 million;

42.     The same day, CPI conducted a conference call to discuss the financial results with analysts and investors.  During the call, defendant Palazzolo stated: "Following the adoption of ASC 606, our revenue recognition on all of our current contracts has not changed materially for both the first quarter and over the life of those contracts."

43.     The same day, defendants McCrosson, Palazzolo, Stinson, Bond, Faber, Paulick, Rosenfeld, and Bazaar caused CPI to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 (the "1Q18 10-Q").  Therein, the Company stated that "[f]ollowing the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice."  Regarding ASC 606, the Company further stated:

> Revenues for the Company's long-term contracts are recognized over time as the Company performs its obligations because of continuous transfer of control to the customer. The continuous transfer of control to the customer is supported by clauses in contracts that either allow the customer to unilaterally terminate the contract for convenience, pay the Company for costs incurred plus a reasonable profit and the products and services have no alternative use or the customer controls the work in progress.

***Because of control transferring over time, revenue is recognized based on the extent of progress towards completion of the performance obligation.*** The selection of the method to measure progress towards completion requires judgment and is based on the nature of the products or services to be provided. The Company uses the cost-to-cost input method to measure of progress for its contracts because it best depicts the transfer of assets to the customer which occurs as the Company incurs costs on its contracts.

In applying the cost-to-cost input method, ***the Company compares the actual costs incurred relative to the total estimated costs to determine its progress towards contract completion and to calculate the corresponding amount of estimated revenue and estimated gross profit recognized.*** For any costs incurred that do not contribute to a performance obligation, the Company excludes such costs from its input methods of revenue recognition as the amounts are not reflective in transferring control of the asset to the customer. Costs to fulfill include labor, materials and subcontractors' costs, other direct costs and an allocation of indirect costs.

\*       \*       \*

***ASC 606 requires sales and gross profit to be recognized over the contract period as work is performed based on the relationship between actual costs incurred and total estimated costs at the completion of the contract.*** Recognized revenues that will not be billed under the terms of the contract until a later date are recorded as an asset captioned "Contract assets." Contracts where billings to date have exceeded recognized revenues are recorded as a liability captioned "Contract liabilities." Changes to the original estimates may be required during the life of the contract. Estimates are reviewed monthly and the effect of any change in the estimated gross margin percentage for a contract is reflected in cost of sales in the period the change becomes known.

44.    As to the financial results reported in the previously issued press release, the 1Q18 10-Q affirmed the previously reported financial results.  Specifically, it stated, in relevant part:

***Revenue***

Revenue for the three months ended March 31, 2018 was $18,191,623 compared to $20,032,701 for the same period last year, a decrease of $1,841,078 or 9.2%. This decrease is predominantly the result of a normal cyclical decrease in revenue on the Company's E-2D programs for both domestic and foreign sales.

\*       \*       \*

***Cost of sales***

Cost of sales for the three months ended March 31, 2018 and 2017 was $14,141,755 and $15,495,187, respectively, a decrease of $1,353,432 or 8.7%, This decrease is the result of the comparable decline in revenue.

\*     \*     \*

### Gross Profit

Gross profit for the three months ended March 31, 2018 was $4,049,868 compared to $4,537,514 for the three months ended March 31, 2017, a decrease of $487,646, predominately the result of lower volume.

\*     \*     \*

### Net Income

Net income for the three months ended March 31, 2018 was $1,256,765 or $0.14 per basic share, compared to $1,249,301 or $0.14 per basic share, for the same period last year. Diluted income per share was $0.14 for the three months ended March 31, 2018 calculated utilizing 8,940,385 weighted average shares outstanding. Diluted income per share for the three months ended March 31, 2017 was $0.14, calculated utilizing 8,830,953 average shares outstanding as adjusted for the dilutive effect of outstanding stock options and RSUs.

45.     The 1Q18 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants McCrosson and Palazzolo, attesting to the accuracy of the financial reporting and the effectiveness of the Company's internal control over financial reporting.

46.     The above statements in ¶¶ 41-45 were materially misleading because they failed to disclose: (i) that the "use of a manufacturing program" was used as the unit of accounting in CPI's historical revenue recognition policy; (ii) that CPI's revenue recognition policy did not use performance obligations as the unit of accounting, as required by ASC Topic 606; (iii) that adoption of ASC Topic 606 required a material change in CPI's revenue recognition policy; and (iv) that there was a material weakness in CPI's internal control over financial reporting due to the failure to properly adopt ASC Topic 606; (v) that, as a result of the foregoing, the Company's reported revenue for first quarter 2018 was overstated by 21% and its gross profit was overstated

by 268%; and (vi) that as a result, the Company incurred a net loss, rather than net income, for first quarter 2018.

**Second Quarter 2018**

47.     On August 8, 2018, defendants McCrosson, Palazzolo, Stinson, Bond, Faber, Paulick, Rosenfeld, and Bazaar caused CPI to issue a press release announcing its second quarter 2018 financial results, which stated in relevant part:

> Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 Revenue from Contracts with Customers ("ASC 606") using the modified retrospective method. None of the Company's contracts' revenue recognition changed materially as a result of the adoption of ASC 606.
>
> **2Q 2018 vs. 2Q 2017**
>
> - Revenue was $20.3 million compared to $16.7 million;
> - Gross profit was $4.6 million compared to $3.7 million;
> - Gross margin was 22.6% compared to 22.0%;
> - Pre-tax income was $1.6 million compared to $1.2 million;
> - Net income was $1.3 million compared to $0.8 million;

48.     The same day, CPI conducted a conference call to discuss the financial results with analysts and investors.  During the call, defendant Palazzolo stated: "Following the adoption of ASC 606, our revenue recognition on all of our current contracts has not changed materially over the life of those contracts."

49.     On August 9, 2018, defendants McCrosson, Palazzolo, Stinson, Bond, Faber, Paulick, Rosenfeld, and Bazaar caused CPI to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 (the "2Q18 10-Q"), affirming the results reported in the press release.  Specifically, it stated:

*Revenue*

Revenue for the three months ended June 30, 2018 was $20,261,239 compared to $16,731,951 for the same period last year, an increase of $3,529,288 or 21.1%. This increase is predominantly the result of ramping up of the next generation jammer

pod program and the production of T-38 kits, offset by a normal cyclical decrease in revenue on the Company's E-2D programs for both domestic and foreign sales.

\* \* \*

### Cost of sales

Cost of sales for the three months ended June 30, 2018 and 2017 was $15,676,421 and $13,048,203, respectively, an increase of $2,628,218 or 20.1%, This increase is the result of the comparable increase in revenue.

\* \* \*

### Gross Profit

Gross profit for the six months ended June 30, 2018 was $8,634,686 compared to $8,221,262 for the six months ended June 30, 2017, an increase of $413,424 or 5.0%, predominately the result of higher volume.

Gross profit for the three months ended June 30, 2018 was $4,584,818 compared to $3,683,748 for the three months ended June 30, 2017, an increase of $901,070 or 24.5%, predominately the result of higher volume.

\* \* \*

### Net Income

Net income for the three months ended June 30, 2018 was $1,257,225 or $0.14 per basic share, compared to $765,647 or $0.09 per basic share, for the same period last year. Net income for the six months ended June 30, 2018 was $2,513,990 or $0.28 per basic share, compared to $2,014,948 or $0.23 per basic share, for the same period last year.

50.     The 2Q18 10-Q contained SOX certifications signed by defendants McCrosson and Palazzolo, attesting to the accuracy of the financial reports and the effectiveness of its internal control over financial reporting.

51.     The above statements in ¶¶ 47-50 were materially misleading because they failed to disclose: (i) that the "use of a manufacturing program" was used as the unit of accounting in CPI's historical revenue recognition policy; (ii) that CPI's revenue recognition policy did not use performance obligations as the unit of accounting, as required by ASC Topic 606; (iii) that adoption of ASC Topic 606 required a material change in CPI's revenue recognition policy; and

(iv) that there was a material weakness in CPI's internal control over financial reporting due to the failure to properly adopt ASC Topic 606; (v) that, as a result of the foregoing, the Company's reported revenue for second quarter 2018 was overstated by nearly 18% and its gross profit was overstated by 338%; and (vi) that as a result, the Company incurred a net loss, rather than net income, for second quarter 2018.

### October 2018 Offering

52.     In October 2018, CPI conducted a secondary public offering (the "October 2018 Offering") in which it sold 2.76 million shares of common stock at a price of $6.25 per share.  The Company received $16.10 million in proceeds, net of underwriting discounts, commissions, and other offering expenses.  The October 2018 Offering was completed pursuant to prospectus supplements filed on October 15, 2018 and October 17, 2018 (together, the "Prospectus").  The Prospectus incorporated by reference the 2017 10-K, the 1Q18 10-Q, and the 2Q18 10-Q.

53.     The above statements in ¶ 52 were materially misleading because they failed to disclose: (i) that the "use of a manufacturing program" was used as the unit of accounting in CPI's historical revenue recognition policy; (ii) that CPI's revenue recognition policy did not use performance obligations as the unit of accounting, as required by ASC Topic 606; (iii) that adoption of ASC Topic 606 required a material change in CPI's revenue recognition policy; and (iv) that there was a material weakness in CPI's internal control over financial reporting due to the failure to properly adopt ASC Topic 606; and (v) that, as a result of the foregoing, the Company's reported revenue and gross profit were overstated for the first half of 2018 and the Company incurred a net loss.

*Third Quarter 2018*

54.     On November 8, 2018, defendants McCrosson, Palazzolo, Stinson, Bond, Faber, Paulick, Rosenfeld, and Bazaar caused CPI to issue a press release announcing its third quarter 2018 financial results, which stated in relevant part:

**3Q 2018 vs. 3Q 2017**

- Revenue was $19.9 million compared to $20.7 million;
- Gross profit was $4.8 million compared to $4.9 million;
- Gross margin was 24.1% compared to 23.7%
- Pre-tax income was $1.6 million compared to $2.5 million;
- Net income was $1.3 million compared to $1.7 million;

55.     The same day, CPI conducted a conference call to discuss the financial results with analysts and investors.  During the call, defendant Palazzolo stated: "Following the adoption of ASC 606, our revenue recognition on all of our current contracts had not changed materially over the life of those contracts."

56.     On November 13, 2018, defendants McCrosson, Palazzolo, Stinson, Bond, Faber, Paulick, Rosenfeld, and Bazaar caused CPI to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018 (the "3Q18 10-Q"), affirming the previously reported financial results.  Specifically, it stated:

*Revenue*

Revenue for the three months ended September 30, 2018 was $19,944,558 compared to $20,706,460 for the same period last year, a decrease of $761,902 or 3.7%. This decrease is predominantly the result of the wind-down of our current Northrop Grumman E-2D multi-year program as we begin transitioning to a new multi-year contract, partially offset by increased revenue from our prime contracts direct with the U.S. Government for F-16 components and T-38 kits.

*        *        *

*Cost of sales*

Cost of sales for the three months ended September 30, 2018 and 2017 was $15,146,080 and $15,794,024, respectively, a decrease of $647,944 or 4.1%. This decrease is the result of the comparable decrease in revenue.

*     *     *

***Gross Profit***

Gross profit for the nine months ended September 30, 2018 was $13,433,164 compared to $13,133,698 for the nine months ended September 30, 2017, an increase of $299,466 or 2.3%, predominately the result of higher volume.

Gross profit for the three months ended September 30, 2018 was $4,798,478 compared to $4,912,436 for the three months ended September 30, 2017, a decrease of $113,958 or 2.3%, predominately the result of lower volume.

*     *     *

***Net Income***

Net income for the three months ended September 30, 2018 was $1,328,153 or $0.15 per basic share, compared to $1,695,513 or $0.19 per basic share, for the same period last year. Net income for the nine months ended September 30, 2018 was $3,842,143 or $0.43 per basic share, compared to $3,710,461 or $0.42 per basic share, for the same period last year.

57.     The 3Q18 10-Q also contained SOX certifications signed by defendants McCrosson and Palazzolo, attesting to the accuracy of the financial reports and the effectiveness of its internal control over financial reporting.

58.     The above statements in ¶¶ 54-57 were materially misleading because they failed to disclose: (i) that the "use of a manufacturing program" was used as the unit of accounting in CPI's historical revenue recognition policy; (ii) that CPI's revenue recognition policy did not use performance obligations as the unit of accounting, as required by ASC Topic 606; (iii) that adoption of ASC Topic 606 required a material change in CPI's revenue recognition policy; and (iv) that there was a material weakness in CPI's internal control over financial reporting due to the failure to properly adopt ASC Topic 606; (v) that a billing error caused an overstatement of revenue by more than $900,000; (vi) that, as a result of the foregoing, the Company's reported revenue for

third quarter 2018 was overstated by 20% and its gross profit was overstated by 572%; and (vii)

that as a result, the Company incurred a net loss, rather than net income, for third quarter 2018.

> **D.    A Red Flag Waves While the Individual Defendants Continue to Issue Materially Misleading Statements**

59.    On February 8, 2019, CPI disclosed that its financial statements for the three and

nine months ended September 30, 2018 reported in its Form 10-Q could no longer be relied upon

due to an "error . . . in the Company's billing process."  According to the Company, the alleged

error inflated the Company's revenue and income before provision for income taxes, net income,

and earnings per share for each such period.  In a Form 8-K filed with the SEC, CPI stated, in

relevant part:

> The identification of the error was made by management during the Company's review of the billing process for the year ended December 31, 2018 in connection with the preparation of the Company's 2018 financial statements. Management's preliminary conclusion is that the error was limited to one instance and that the effect of correcting the ***foregoing error in the Company's financial statements for the three and nine months ended September 30, 2018 is (i) a reduction of revenue and income before provision for income taxes of approximately $900,000 to $950,000, (ii) a reduction of net income of approximately $725,000 to $775,000 and (iii) a reduction of fully diluted earnings per share of approximately $ 0.09, for each such period.*** The error is not expected to have a material impact on the Company's balance sheet as of September 30, 2018 or the statement of cashflows for the three and nine months ended September 30, 2018.

60.    In addition, the Company reported material weaknesses in its internal controls:

> In connection with the restatement noted above, ***management has determined that a material weakness existed in the Company's internal control over financial reporting as of September 30, 2018. As a result, the Company's chief executive officer and chief financial officer have concluded that the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2018.*** A discussion of the Company's plan to remediate the material weakness will be contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2018, which the Company expects to file with Securities and Exchange Commission on or before its filing deadline.

61.    On this news, CPI's stock price fell $0.59 per share, or over 8.5%, to close at $6.34

per share on February 8, 2019, on unusually heavy trading volume.

62.     On February 27, 2019, defendants McCrosson, Palazzolo, Stinson, Bond, Faber, Paulick, Rosenfeld, and Bazaar caused CPI to file its amended Form 10-Q for the period ended September 30, 2018 (the "Amended 3Q18 10-Q").  Therein, CPI stated:

### Revenue

Revenue for the three months ended September 30, 2018 was $19,017,301 compared to $20,706,460 for the same period last year, a decrease of $1,689,159 or 8.2%. This decrease is predominantly the result of the wind-down of our current Northrop Grumman E-2D multi-year program as we begin transitioning to a new multi-year contract, partially offset by increased revenue from our prime contract direct with the U.S. Government for T-38 kits.

*       *       *

### Cost of sales

Cost of sales for the three months ended September 30, 2018 and 2017 was $15,146,080 and $15,794,024, respectively, a decrease of $647,944 or 4.1%. This decrease is the result of the comparable decrease in revenue.

*       *       *

### Gross Profit

Gross profit for the nine months ended September 30, 2018 was $12,505,907 compared to $13,133,698 for the nine months ended September 30, 2017, an decrease of $627,791 or 4.8%, predominately the result of lower margin work on the T-38 program and the Raytheon pod, which are still in the early stage of production.

Gross profit for the three months ended September 30, 2018 was $3,871,221 compared to $4,912,436 for the three months ended September 30, 2017, a decrease of $1,041,215 or 21.2%, predominately the result of lower volume, as well as lower margin on early stage programs.

*       *       *

### Net Income

Net income for the three months ended September 30, 2018 was $585,896 or $0.07 per basic share, compared to $1,695,513 or $0.19 per basic share, for the same period last year. Net income for the nine months ended September 30, 2018 was $3,099,886 or $0.35 per basic share, compared to $3,710,461 or $0.42 per basic share, for the same period last year.

63.     The Amended 3Q18 10-Q also stated that the following material weakness in CPI's internal control over financial reporting existed as of the period ended September 30, 2018: "the review control procedures failed to identify, in a timely manner, the miscoding of an invoice in the Company's records and the resulting overstatement of revenue."

64.     The above statements in ¶¶ 59-60, 62-63 were materially misleading because they failed to disclose: (i) that the "use of a manufacturing program" was used as the unit of accounting in CPI's historical revenue recognition policy; (ii) that CPI's revenue recognition policy did not use performance obligations as the unit of accounting, as required by ASC Topic 606; (iii) that adoption of ASC Topic 606 required a material change in CPI's revenue recognition policy; and (iv) that there was a material weakness in CPI's internal control over financial reporting due to the failure to properly adopt ASC Topic 606; (v) that, as a result of the foregoing, the Company's reported revenue for third quarter 2018 was overstated by 20% and its gross profit was overstated by 572%; and (vi) that as a result, the Company incurred a net loss, rather than net income, for third quarter 2018.

*Fiscal 2018*

65.     On March 13, 2019, defendants McCrosson, Palazzolo, Stinson, Bond, Faber, Paulick, Rosenfeld, and Bazaar caused CPI to issue a press release announcing the Company's fourth quarter and full year 2018 financial results.  Therein, the Company stated, in relevant part:

**Full Year 2018 vs. Full Year 2017**
- Revenue was $83.9 million compared to $81.3 million;
- Gross profit was $18.3 million compared to $18.6 million;
- Gross margin was 21.8% compared to 22.9%;
- Pre-tax income was $6.8 million compared to $8.5 million;
- Net income was $2.3 million compared to $5.8 million;

66.     The same day, CPI conducted a conference call to discuss the financial results with analysts and investors.  During the call, defendant Palazzolo stated: "Following the adoption of

ASC 606, our revenue recognition on all of our current contracts has not changed materially over the life of those contracts."

67.    On April 1, 2019, defendants McCrosson, Palazzolo, Stinson, Bond, Faber, Paulick, Rosenfeld, and Bazaar signed and caused CPI to file its annual report on Form 10-K with the SEC for the period ended December 31, 2018 (the "2018 10-K"), affirming the previously reported financial results.  Specifically, it stated:

> *Revenue.* Revenue for the year ended December 31, 2018 was $83,929,270 compared to $81,283,148 for the year ended December 31, 2017, representing an increase of $2,646,122.
>
> Overall, revenue generated from prime government contracts for the year ended December 31, 2018 was $9,216,671 compared to $6,647,248 for the year ended December 31, 2017, an increase of $2,569,422. This increase is a result of revenue recognized on the T-38C Pacer Classic III aircraft structural modification program, as this program has transitioned from the start-up stage to the delivery stage.
>
> *            *            *
>
> *Cost of sales.* Cost of sales for the years ended December 31, 2018 and 2017 was $65,765,007 and $62,637,232, respectively, an increase of $3,127,775 or 5.0%.
>
> *            *            *
>
> *Gross profit.* Gross profit for the year ended December 31, 2018 was $18,164,263 compared to $18,645,916 for the year ended December 31, 2017, a decrease of $481,653. Gross profit percentage ("gross margin") for the year ended December 31, 2018 was 21.6% compared to 22.9% for the same period last year, predominately the result of fade in gross margin on the Company's G650 program, as we experienced some production issues in 2018 which resulted in higher labor costs than estimated.
>
> *            *            *
>
> *Income from operations.* We had income from operations for the year ended December 31, 2018 of $8,635,380 compared to income from operations of $10,196,322 for the year ended December 31, 2017. The decrease was predominately the result in the decrease in gross profit described above, and the increase in selling, general and administrative expenses described above.

68.    The 2018 10-K also contained SOX certifications signed by defendants McCrosson and Palazzolo, attesting to the accuracy of the financial reports.  With respect to the internal control

over financial reporting, the 2018 10-K stated that "because the material weakness [that existed as of September 30, 2018] was not discovered until February of 2019, . . . the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of December 31, 2018."

69.     The above statements in ¶¶ 65-68 were materially misleading because they failed to disclose: (i) that the "use of a manufacturing program" was used as the unit of accounting in CPI's historical revenue recognition policy; (ii) that CPI's revenue recognition policy did not use performance obligations as the unit of accounting, as required by ASC Topic 606; (iii) that adoption of ASC Topic 606 required a material change in CPI's revenue recognition policy; and (iv) that there was a material weakness in CPI's internal control over financial reporting due to the failure to properly adopt ASC Topic 606; (v) that, as a result of the foregoing, the Company's reported revenue for fiscal 2018 was overstated by 20% and its gross profit was overstated by 331%; (vi) that as a result, the Company incurred a net loss, rather than net income, for fiscal 2018; and (vii) that CPI's contract assets was overstated by 544% and backlog was overstated by 12%.

***First Quarter 2019***

70.     On May 10, 2019, defendants McCrosson, Palazzolo, Stinson, Bond, Cooper, Faber, Paulick, Rosenfeld, and Bazaar caused CPI to issue a press release announcing its first quarter 2019 financial results.  Therein, the Company stated, in relevant part:

### First Quarter 2019 vs. First Quarter 2018

- Revenue of $25.6 million compared to $18.2 million
- Gross profit of $5.4 million compared to $4.0 million
- Gross margin was 21.2% compared to 22.3%
- Pre-tax income of $2.1 million compared to $1.6 million
- Net income of $1.7 million compared to $1.3 million
- Earnings per diluted share of $0.14 compared to $0.14 on a higher number of shares outstanding

- Total backlog at $452.9 million with multi-year defense contracts comprising 84%

71.   The same day, defendants McCrosson, Palazzolo, Stinson, Bond, Cooper, Faber, Paulick, Rosenfeld, and Bazaar caused CPI to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 (the "1Q19 10-Q"), affirming the previously reported financial results.  Specifically, it stated:

*Revenue*

Revenue for the three months ended March 31, 2019 was $25,583,531 compared to $18,191,623 for the same period last year, an increase of $7,391,908 or 40.6%. Approximately $2.1 million of this increase is the result of the inclusion of WMI revenue, which we acquired in December of 2018. Additionally, there was an increase of $4.3 million because of the increasing production rates of the Next Generation Jammer pod program as we continue work on pod version 2.0. We also had increases of approximately $0.7 million on the Company's E-2D program, $0.7 million on the F-35 Lock program and $0.7 million on the Company's HondaJet program, as these programs are increasing production in 2019.

*       *       *

*Cost of sales*

Cost of sales for the three months ended March 31, 2019 and 2018 was $20,167,721 and $14,141,755, respectively, an increase of $6,025,966 or 42.6%. This increase is the result of the comparable increase in revenue.

*       *       *

*Gross Profit*

Gross profit for the three months ended March 31, 2019, was $5,415,810 compared to $4,049,868 for the three months ended March 31, 2018, an increase of $1,365,942 or 33.7%, predominately the result of higher volume.

*       *       *

*Net Income*

Net income for the three months ended March 31, 2019 was $1,658,599 or $0.14 per basic share, compared to $1,256,765 or $0.14 per basic share, for the same period last year.

72.     The 1Q19 10-Q stated that "contract assets include unbilled amounts when the estimated revenues recognized exceed the amount billed to the customer and right to payment is not just subject to the passage of time. Amounts may not exceed their net realizable value."  It also defined contract liabilities as "billings in excess of estimated revenues recognized and contract losses."  For the first quarter 2019, CPI reported:

| | March 31, 2019 | | |
| | U.S. Government | Commercial | Total |
|---|---|---|---|
| Contract assets | $ 51,201,427 | $ 69,548,491 | $ 120,749,918 |
| Contract liabilities | (3,468,415) | (28,034) | (3,496,449) |
| Net contract assets | $ 47,733,012 | $ 69,520,457 | $ 117,253,469 |

73.     Regarding the Company's backlog, the 1Q19 10-Q stated:

**Backlog**

We produce custom assemblies pursuant to long-term contracts and customer purchase orders. Backlog consists of aggregate values under such contracts and purchase orders, excluding the portion previously included in operating revenues pursuant to ASC 606, and including estimates of future contract price escalation. Substantially all of our backlog is subject to termination at will and rescheduling, without significant penalty. Funds are often appropriated for programs or contracts on a yearly or quarterly basis, even though the contract may call for performance that is expected to take a number of years. Therefore, our funded backlog does not include the full value of our contracts. Our total backlog as of March 31, 2019 and December 31, 2018 was as follows:

| Backlog (Total) | March 31, 2019 | December 31, 2018 |
|---|---|---|
| Funded | $       85,669,000 | $      94,474,000 |
| Unfunded | 367,206,000 | 362,906,000 |
| Total | $      452,875,000 | $     457,380,000 |

74.     The 1Q19 10-Q also contained SOX certifications signed by defendants McCrosson and Palazzolo, attesting to the accuracy of the financial reports.  However, with respect to CPI's internal control over financial reporting, the report stated:

The following material weakness in the Company's internal control over financial reporting was identified subsequent to September 30, 2018 and still exists as of March 31, 2019: that the review control procedures failed to identify, in a timely

manner, the miscoding of an invoice in the Company's records and the resulting overstatement of revenue. . . . The Company has reviewed its financial closing process and has identified the corrective action to remediate the control failure that was the cause of this error and has implemented this control as well as certain other procedures in the first quarter of 2019. The Company believes that the corrective action and implementation of the new control procedures will provide reasonable assurance that this type of error will not occur in the future; however, we have not concluded our evaluation because we have not fully tested the new control.

75.     The above statements in ¶¶ 70-74 were materially misleading because they failed to disclose: (i) that the "use of a manufacturing program" was used as the unit of accounting in CPI's historical revenue recognition policy; (ii) that CPI's revenue recognition policy did not use performance obligations as the unit of accounting, as required by ASC Topic 606; (iii) that adoption of ASC Topic 606 required a material change in CPI's revenue recognition policy; and (iv) that there was a material weakness in CPI's internal control over financial reporting due to the failure to properly adopt ASC Topic 606; (v) that, as a result of the foregoing, the Company's reported revenue for first quarter 2019 was overstated by 16% and its gross profit was overstated by 118%; (vi) that as a result, the Company incurred a net loss, rather than net income, for first quarter 2019; and (vii) that CPI's contract assets was overstated by 510% and backlog was overstated by 16%.

### Second Quarter 2019

76.     On August 7, 2019, defendants McCrosson, Palazzolo, Stinson, Bond, Cooper, Faber, Paulick, and Rosenfeld caused CPI to issue a press release announcing its second quarter 2019 financial results.  Therein, the Company stated, in relevant part:

> **Second Quarter 2019 vs. Second Quarter 2018**
> - Revenue of $23.2 million compared to $20.3 million
> - Gross profit of $5.0 million compared to $4.6 million
> - Gross margin was 21.4% compared to 22.6%
> - Pre-tax income of $1.7 million compared to $1.6 million
> - Net income of $2.7 million compared to $1.3 million, including a tax benefit of approximately $1.0 million due to the reversal of a portion of the

approximately $3.1 million liability that was recorded at December 31, 2018 for an uncertain tax position related to a federal income tax audit

- Earnings per diluted share of $0.23 compared to $0.14 on a higher number of shares outstanding, including $0.09 per diluted share arising from the aforementioned reversal of a tax liability
- Total backlog at $447.6 million with multi-year defense contracts comprising 86%

77.    On August 8, 2019, defendants McCrosson, Palazzolo, Stinson, Bond, Cooper, Faber, Paulick, and Rosenfeld caused CPI to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2Q19 10-Q"), affirming the previously reported financial results.  Specifically, it stated:

***Revenue***

Revenue for the three months ended June 30, 2019 was $23,158,251 compared to $20,261,239 for the same period last year, an increase of $2,897,012 or 14.3%. Approximately $1.8 million of this increase is the result of the inclusion of WMI revenue, which we acquired in December of 2018. Additionally, there was an increase of $3.1 million because of the increasing production rates of the Next Generation Jammer pod program. These increases were offset by a decrease in revenue on the G650 program.

\*        \*        \*

***Cost of sales***

Cost of sales for the three months ended June 30, 2019 and 2018 was $18,202,069 and $15,676,421, respectively, an increase of $2,525,648 or 16.1%. This increase is the result of the comparable increase in revenue.

\*        \*        \*

***Gross Profit***

Gross profit for the three months ended June 30, 2019 was $4,956,182 compared to $4,584,818 for the three months ended June 30, 2018, an increase of $371,364 or 8.1%, predominately the result of higher volume.

\*        \*        \*

***Net Income***

Net income for the three months ended June 30, 2019 was $2,710,457 or $0.23 per basic share, compared to $1,257,225 or $0.14 per basic share, for the same period last year.

78.     The 2Q19 10-Q reported CPI's contract assets and contract liabilities as:

| | June 30, 2019 | | |
|---|---|---|---|
| | U.S. Government | Commercial | Total |
| Contract assets | $ 50,056,686 | $ 70,197,693 | $120,254,379 |
| Contract liabilities | (3,486,110) | (2,713) | (3,488,823) |
| Net contract assets | $ 46,570,576 | $ 70,194,980 | $116,765,556 |

79.     And as to backlog, the 2Q19 10-Q stated:

| Backlog (Total) | June 30, 2019 | December 31, 2018 |
|---|---|---|
| Funded | $    94,050,000 | $    94,474,000 |
| Unfunded | 353,519,000 | 362,906,000 |
| Total | $   447,569,000 | $   457,380,000 |

80.     The 2Q19 10-Q also contained SOX certifications signed by defendants McCrosson and Palazzolo, attesting to the accuracy of the financial reports.  However, as to internal control over financial reporting, the 2Q19 10-Q stated:

The following material weakness was identified subsequent to September 30, 2018 and still exists as of June 30, 2019. The review control procedures were inadequately designed to ensure that sales invoices were coded to the correct contract type. The result was a failure to identify, in a timely manner, the miscoding of an invoice in the Company's records and the resulting overstatement of revenue. . . . The Company has reviewed its financial closing process and has identified the corrective action to remediate the control failure that was the cause of this error and has implemented this control as well as certain other procedures in the first quarter of 2019. The Company believes that the corrective action and implementation of the new control procedures will provide reasonable assurance that this type of error will not occur in the future; however, we have not concluded our evaluation because we have not fully tested the new control.

81.     The above statements in ¶¶ 76-80 were materially misleading because they failed to disclose: (i) that the "use of a manufacturing program" was used as the unit of accounting in CPI's historical revenue recognition policy; (ii) that CPI's revenue recognition policy did not use

29

performance obligations as the unit of accounting, as required by ASC Topic 606; (iii) that adoption of ASC Topic 606 required a material change in CPI's revenue recognition policy; and (iv) that there was a material weakness in CPI's internal control over financial reporting due to the failure to properly adopt ASC Topic 606; (v) that, as a result of the foregoing, the Company's reported revenue for second quarter 2019 was overstated by 15% and its gross profit was overstated by 120%; (vi) that as a result, the Company incurred a net loss, rather than net income, for second quarter 2019; and (vii) that CPI's contract assets was overstated by 644% and backlog was overstated by more than 13%.

***Third Quarter 2019***

82.     On November 6, 2019, defendants McCrosson, Palazzolo, Stinson, Bond, Cooper, Faber, Paulick, and Rosenfeld caused CPI to issue a press release announcing its third quarter 2019 financial results.  Therein, the Company stated, in relevant part:

### **Third Quarter 2019 vs. Third Quarter 2018**

- Revenue of $25.7 million compared to $19.0 million, an increase of 35%;
- Gross profit of $5.0 million compared to $3.9 million, an increase of 28%;
- Gross margin was 19.3% compared to 20.4%, a decrease of 110 basis points;
- Pre-tax income of $2.0 million compared to $0.7 million, an increase of 186%;
- Net income of $1.7 million compared to $0.6 million; an increase of 183%
- Earnings per diluted share of $0.14 compared to $0.07, an increase of 100% on a higher number of shares outstanding;
- Record total backlog at $533.9 million, up $86.3 million during the quarter;

83.     On November 8, 2019, defendants McCrosson, Palazzolo, Stinson, Bond, Cooper, Faber, Paulick, and Rosenfeld caused CPI to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019, affirming the previously reported financial results. Specifically, it stated:

***Revenue***

Revenue for the three months ended September 30, 2019 was $25,711,153 compared to $19,017,301 for the same period last year, an increase of $6,693,852 or 35.2%. Approximately $5.2 million of this increase is the result of the inclusion of WMI revenue, which we acquired in December of 2018. Additionally, there was an increase of $1.3 million related to the E-2D program.

*     *     *

*Cost of sales*

Cost of sales for the three months ended September 30, 2019 and 2018 was $20,748,065 and $15,146,080, respectively, an increase of $5,601,985 or 37%. This increase is the result of the comparable increase in revenue.

*     *     *

*Gross Profit*

Gross profit for the three months ended September 30, 2019 was $4,963,088 compared to $3,871,221 for the three months ended September 30, 2018, an increase of $1,091,867 or 28.2%, predominately the result of higher volume. Gross profit percentage three months ended September 30, 2019 was 19.3% compared to 20.4% for the three months ended September 30, 2018, a decrease of 1.1%, predominately the result of a lower margin from WMI.

*     *     *

*Net Income*

Net income for the three months ended September 30, 2019 was $1,666,913 or $0.14 per basic share, compared to $585,896 or $0.07 per basic share, for the same period last year.

84.     The 3Q19 10-Q stated that CPI's contract assets and liabilities were:

|  | September 30, 2019 | | |
|  | U.S. Government | Commercial | Total |
| --- | --- | --- | --- |
| Contract assets | $ 49,657,016 | $ 71,801,068 | $121,458,084 |
| Contract liabilities | (1,819,792) | (3,463) | (1,823,255) |
| Net contract assets | $ 47,837,224 | $ 71,797,605 | $119,634,829 |

85.     And as to backlog, the 3Q19 10-Q stated:

| Backlog (Total) | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Funded | $ 104,509,000 | $ 94,474,000 |
| Unfunded | 429,396,000 | 362,906,000 |
| Total | $ 533,905,000 | $ 457,380,000 |

86.     The 3Q19 10-Q also contained SOX certifications signed by defendants McCrosson and Palazzolo, attesting to the accuracy of the financial reports and the effectiveness of its internal control over financial reporting.  Specifically, it stated:

> The following material weakness was identified subsequent to September 30, 2018. The review control procedures were inadequately designed to ensure that sales invoices were coded to the correct contract type. The result was a failure to identify, in a timely manner, the miscoding of an invoice in the Company's records and the resulting overstatement of revenue. . . . The Company has reviewed its financial closing process and has identified the corrective action to remediate the control failure that was the cause of this error and has implemented this control as well as certain other procedures in the first quarter of 2019. The Company has evaluated the effectiveness of the corrective action and has determined that the implementation of the new control procedures provides reasonable assurance that this type of error will not occur in the future.

87.     The above statements in ¶¶ 82-86 were materially misleading because they failed to disclose: (i) that the "use of a manufacturing program" was used as the unit of accounting in CPI's historical revenue recognition policy; (ii) that CPI's revenue recognition policy did not use performance obligations as the unit of accounting, as required by ASC Topic 606; (iii) that adoption of ASC Topic 606 required a material change in CPI's revenue recognition policy; and (iv) that there was a material weakness in CPI's internal control over financial reporting due to the failure to properly adopt ASC Topic 606; (v) that, as a result of the foregoing, the Company's reported revenue for third quarter 2019 was overstated by 13% and its gross profit was overstated by 156%; (vi) that as a result, the Company incurred a net loss, rather than net income, for third quarter 2019; and (vii) that CPI's contract assets was overstated by 738% and backlog was overstated by 2%.

E.      **The Truth Fully Emerges**

1.      **CPI Discloses That It Incorrectly Applied ASC 606**

88.     On February 14, 2020, the Company revealed that its financial statements for several periods should no longer be relied upon due to errors related to recognition of revenue from contracts with customers under ASC Topic 606.  Specifically, CPI filed a Form 8-K with the SEC, stating in relevant part:

> On February 12, 2020, the audit committee of the board of directors ("Audit Committee") of CPI Aerostructures, Inc. (the "Company"), determined, based on the recommendation of management and in consultation with CohnReznick LLP ("CohnReznick"), the Company's independent registered public accounting firm, that the Company's financial statements which were included in its annual report on Form 10-K for the year ended December 31, 2018, quarterly reports on Forms 10-Q for the quarters ended March 31, 2018, June 30, 2018, and September 30, 2018 and quarterly reports on Forms 10-Q for the quarters ended March 31, 2019, June 30, 2019, and September 30, 2019 *should no longer be relied upon due to an error in such financial statements relating to the Company's recognition of revenue from contracts with customers under ASC Topic 606. Similarly, CohnReznick's reports on the effectiveness of internal control over financial reporting for the year ended December 31, 2018, management's reports on the effectiveness of internal control over financial reporting, press releases, and investor communications describing the Company's financial statements for such periods should no longer be relied upon.* The Company's cash flows from operations for the affected periods are not expected to be impacted.
>
> The error was uncovered as part of the preparation of the Company's financial statements for the year ended December 31, 2019. After reconsideration of the terms of the Company's contracts with customers, *Management's preliminary conclusion is that certain revenues and net income were recognized prematurely or inaccurately due to an incorrect application of generally accepted accounting principles. Therefore, previously reported revenue and net income are believed to have been overstated.* The error is also expected to have an impact on the Company's balance sheet for the affected periods. *Specifically, retained earnings and contract assets are believed to be overstated.*

89.     In addition, the Company reported that "a material weakness existed in [its] internal control over financial reporting as of each of the affected periods."

90.     The Company also announced that CFO Dan Azmon resigned from the Company, effective February 11, 2020.  The Board of Directors appointed current director of financial planning and analysis, Thomas Powers, as acting CFO.

91.     On this news, the Company's stock price fell $1.80 per share, or approximately 27%, to close at $4.87 per share on February 14, 2020, injuring investors.

92.     On March 16, 2020, CPI filed a Form 12b-25 with the SEC in which it stated that it could not timely file its annual report on Form 10-K for the period ended December 31, 2019 (the "2019 10-K") until the restatements for the relevant financial statements are completed.

93.     On March 31, 2020, CPI stated that it could not compile and review information to timely file its 2019 10-K by the prescribed date, after taking into account the extension normally available under Rule 12b-25, due to the impact of COVID-19.

94.     On April 22, 2020, CPI disclosed in a Form 8-K that on April 17, 2020, it had received a notice from NYSE Regulation Inc. stating that the Company was not in compliance with listing standards due to the failure to timely file its restated financial statements.

95.     On May 11, 2020, the Company stated in a Form 8-K that it would avail itself of SEC's Order dated March 25, 2020, stating that it expects to file its Form 10-Q for the period ended March 31, 2020 on or before June 25, 2020 (which is 45 days from the original filing deadline).  CPI attributed the delay to the impact of COVID-19, which "has slowed the Company's routine quarterly financial statement close and review processes."  CPI stated: "limited access to the Company's facilities, financial records, and personnel has resulted in slower collection of data, including with respect to estimates of contract performance, reviews of assumptions, and routine inventory count tests, and inefficiencies in providing information to the Company's independent registered public accountants."

96.     However, on June 26, 2020, CPI filed a Form 12b-25 with the SEC, stating that it could not timely file its quarterly report for the period ended March 31, 2020 until the restatements for the relevant financial statements are completed.

### 2.     CPI Restates its Financial Statements for Seven Consecutive Quarters

97.     On August 25, 2020, CPI filed the restated financial results, reflecting that the Company incurred net losses for eight consecutive quarters.  The 2019 10-K, which was filed the same day, explained that CPI had incorrectly applied ASC 606 in connection with the previously issued financial statements. Specifically, the 2019 10-K stated:

> The Company applied the cost-to-cost percentage of completion method at the program level, that is, for the entire duration of production activity on a particular program. The Company used program-level accounting to both measure progress and estimate profit margin. The Company believed that the program was the correct unit of accounting under ASC Topic 606. ***The Company now recognizes that accounting guidance under ASC Topic 606 does not support its use of a manufacturing program as the unit of accounting. Instead, under ASC Topic 606, the performance obligation is the appropriate use of accounting.*** Determining each performance obligation under a particular program requires significant judgment but, in general, under ASC Topic 606, the Company has a performance obligation upon which it can recognize revenue when it has approval and commitment from both parties, the rights of the parties are identified, payment terms are identified and enforceable, the contract has commercial substance and collectability of consideration is probable. For the Company, the contract under ASC 606 is typically established upon execution of a purchase order either in accordance with a long-term customer contract or on a standalone basis. The Company's cost-to-cost input method to measure progress must consider only the costs incurred relative to the total expected costs of satisfying a performance obligation. Similarly, under ASC Topic 606, the Company must estimate profit margins based on expected performance under a performance obligation. ***Revenue and profit margin must be constrained to revenue related to the satisfaction of a performance obligation to which the Company has an enforceable right to payment for performance completed.***
>
> The errors were uncovered as part of the preparation of the Company's consolidated financial statements for the fiscal year ended December 31, 2019. After reconsideration of the terms of the Company's contracts with customers, management concluded that certain revenues and net income were recognized inaccurately due to an incorrect application of generally accepted accounting principles in U.S. GAAP. ***Therefore, previously reported revenue and net income were overstated.***

98.     The 2019 10-K described its revenue recognition policy:

The majority of the Company's performance obligations are satisfied over time as the Company (i) sells products with no alternative use to the Company and (ii) has an enforceable right to recover costs incurred plus a reasonable profit margin for work completed to date. The Company uses the cost-to-cost input method to measure progress for its performance obligations because it best depicts the transfer of control to the customer which occurs as the Company incurs costs on its contracts.

The Company generally utilizes the portfolio approach to estimate the amount of revenue to recognize for its contracts and groups contracts together that have similar characteristics. Contract gross profit margins are calculated using the estimated costs for either the individual contract or the portfolio as applicable. Significant judgment is used to determine which contracts are grouped together to form a portfolio. The portfolio approach is utilized only when the result of the accounting is not expected to be materially different than if applied to individual contracts.

99.     The amended Form 10-Q for the period ended March 31, 2019 (the "Amended 1Q19 10-Q") contained the restated results for the three months ended March 31, 2019 and 2018, reflecting that CPI had incurred a net loss, rather than net income, for both periods.  Specifically, for the period ended March 31, 2018, revenue had been overstated by $3,201,672 (21.36%), cost of sales had been understated by $27,862, and gross profit had been overstated by $2,949,391 (268%).  For the period ended March 31, 2019, revenue had been overstated by $3,595,147 (16.35%), cost of sales had been overstated by $662,753, and gross profit had been overstated by $2,932,394 (118%).  With respect to the balance sheet, as of March 31, 2019, CPI's contract assets[2]

---

[2] According to the Amended 1Q19 10-Q:

Contract assets represent revenue recognized on contracts in excess of amounts invoiced to the customer and the Company's right to consideration is conditional on something other than the passage of time. Amounts may not exceed their net realizable value. Under the typical payment terms of our government contracts, the customer retains a portion of the contract price until completion of the contract, as a measure of protection for the customer. Our government contracts therefore typically result in revenue recognized in excess of billings, which we present as contract assets. Contract assets are classified as current.

had been overstated by $100,971,165 (510%), its contract liabilities[3] had been overstated by $3,190, and its loss reserve had been understated by $2,820,076 (92.86%).  The Company explained:

### Revenue

Revenue for the three months ended March 31, 2019 was $21,988,384 (restated) compared to $14,989,951 (restated) for the same period last year, an increase of $6,998,433 or 46.7%. Primary contributors to the increase were the inclusion of WMI revenue, which we acquired in December of 2018, and therefore not included in the prior-year period, and increased revenue from our Next Generation Jammer pod, the E-2D, and F-16 programs.

*        *        *

### Cost of sales

Cost of sales for the three months ended March 31, 2019 and 2018 was $19,504,968 (restated) and $13,889,474 (restated), respectively, an increase of $5,615,494 or 40.4%. This increase is the result of the comparable increase in revenue.

*        *        *

### Gross Profit

Gross profit for the three months ended March 31, 2019 was $2,483,416 (restated) compared to $1,100,477 (restated) for the three months ended March 31, 2018, an increase of $1,382,939 or 125.7%, primarily the result of higher volume.

*        *        *

### Net Loss

Net loss for the three months ended March 31, 2019 was ($934,716) (restated) or ($0.08) per basic share, compared to a loss of ($1,442,907) (restated) or ($0.16) per basic share, for the same period last year. Diluted loss per share was ($0.08) for the three months ended March 31, 2019 calculated utilizing 11,736,305 weighted average shares outstanding. Diluted loss per share was ($0.16) for the three months ended March 31, 2018 calculated utilizing 8,888,179 (restated) weighted average shares outstanding.

---

[3] Contract liabilities "represent customer payments received or due from the customer in excess of revenue recognized."

100.   The Amended 1Q19 10-Q also showed that backlog had been overstated by $62,974,000 (16%) for first quarter 2019.  Specifically, the Company stated:

**Backlog**

We produce custom assemblies pursuant to long-term contracts and customer purchase orders. Funded backlog consists of aggregate funded values under such contracts and purchase orders, excluding the portion previously included in operating revenues pursuant to ASC 606, and including estimates of future contract price escalation. Unfunded backlog is the estimated amount of future orders under long-term contracts. Substantially all of our backlog is subject to termination at will and rescheduling, without significant penalty. Funds are often appropriated for programs or contracts on a yearly or quarterly basis, even though the contract may call for performance that is expected to take a number of years. Therefore, our funded backlog does not include the full value of our contracts. Our total backlog as of March 31, 2019 and December 31, 2018 was as follows:

| Backlog (Total) | March 31, 2019 (restated) | December 31, 2018 (restated) |
|---|---|---|
| Funded | $ 113,459,000 | $ 121,865,000 |
| Unfunded | 276,442,000 | 286,897,000 |
| Total | $ 389,901,000 | $ 408,762,000 |

101.   The Amended 1Q19 10-Q also identified material weaknesses in CPI's internal control over financial reporting as of March 31, 2019 and March 31, 2018, including that ***no controls existed*** for significant, non-routine, complex transactions:

*<u>Control Environment, Risk Assessment, Control Activities and Monitoring</u>*

We did not maintain effective internal control over financial reporting related to the following areas: control environment, risk assessment, control activities and monitoring:

- Management did not effectively execute a strategy to hire and retain a sufficient complement of personnel with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting.

- Management lacked sufficient technical proficiency and training to provide adequate oversight of accounting and financial reporting activities in implementing certain accounting practices and calculations to conform to the Company's policies and U.S. GAAP.

- There were insufficiently documented Company accounting policies and insufficiently detailed Company procedures to put policies into effective action.

*Revenue Recognition Accounting*

We identified material weaknesses from revenue recognition accounting controls that resulted in material errors, as we did not appropriately design, or effectively operate, internal control over certain aspects of accurate recording, presentation, and disclosure of revenue and related costs. The following were contributing factors to the material weaknesses in revenue recognition accounting:

- Our internal control lacked procedures for ensuring the period of performance or value of the accounting contract were properly determined.

- Our internal control lacked procedures for ensuring revenue was constrained to funded contact values.

*Accounting for Significant Non-Routine Complex Transactions*

We identified a material weakness in our accounting for significant, non-routine, complex transactions. ***No controls exist and we failed to hire qualified external resources with the appropriate accounting expertise.*** While no material errors were identified, the lack of controls caused a reasonable possibility that a material error could have occurred.

*Information Technology General Controls (ITGC)*

There were ineffective ITGCs, specifically in testing and documenting the areas of access to programs and data, program change-management and computer operations. As a result, business process automated and manual controls that were dependent on the affected ITGCs may be ineffective because they could have been adversely impacted. These control deficiencies were a result of: 1) IT control processes that lacked sufficient testing and documentation; 2) risk-assessment processes inadequate to identify and assess changes in IT environments and 3) user access reviews that could impact internal control over financial reporting. While no material errors were identified, the insufficiency of our testing caused a reasonable possibility that a material error could have occurred.

102. The amended Form 10-Q for the period ended June 30, 2019 (the "Amended 2Q19 10-Q") contained the restated results for the three months ended June 30, 2019 and 2018, reflecting that CPI had incurred a net loss, rather than net income, for both periods. Specifically, for the period ended June 30, 2018, revenue had been overstated by $3,085,560 (18%), cost of sales had

been understated by $452,682, and gross profit had been overstated by $3,538,242 (338%).  For the period ended June 30, 2019, revenue had been overstated by $3,056,538 (15%), cost of sales had been overstated by $343,999, and gross profit had been overstated by $2,880,842 (120%). With respect to the balance sheet, as of June 30, 2019, CPI's contract assets had been overstated by $104,091,748 (644%), its contract liabilities had been overstated by $38,340, and its loss reserve had been understated by $2,615,485 (92.35%). The Company explained:

*Revenue*

Revenue for the three months ended June 30, 2019 was $20,101,713 (restated) compared to $17,175,679 (restated) for the same period last year, an increase of $2,926,034 or 17%. Approximately $1.8 million of this increase is the result of the inclusion of WMI revenue, which we acquired in December of 2018. Additionally, there was an increase because of the increasing production rates of the Next Generation Jammer pod program. These increases were offset by a decrease in revenue on the T 38 program.

*       *       *

*Cost of sales*

Cost of sales for the three months ended June 30, 2019 and 2018 was $17,858,070 (restated) and $16,129,103 (restated), respectively, an increase of $1,728,967 or 10.7%. The increase is a result of a 17% higher revenue, indicating an improvement in profit margin from the year-ago period.

*       *       *

*Gross Profit*

Gross profit for the three months ended June 30, 2019 was $2,243,643 (restated) compared to $1,046,576 (restated) for the three months ended June 30, 2018, an increase of $1,197,067 or 114%, primarily on higher revenue and a more favorable product sales mix.

*       *       *

*Net Loss*

Net loss for the three months ended June 30, 2019 was ($881,167) (restated) or ($0.07) per basic share, compared to a loss of ($1,884,106) (restated) or ($0.21) per basic share, for the same period last year. Diluted loss per share was ($0.07) for the three months ended June 30, 2019 calculated utilizing 11,817,713(restated)

weighted average shares outstanding. Diluted loss per share was ($0.21) for the three months ended June 30, 2018 calculated utilizing 8,938,331 (restated) weighted average shares outstanding.

103.    The Amended 2Q19 10-Q also showed that backlog had been overstated by $53,538,000 (13.58%) for second quarter 2019. Specifically, the Company stated:

| Backlog (Total) | June 30, 2019 (restated) | | December 31, 2018 (restated) | |
|---|---|---|---|---|
| Funded | $ | 116,046,000 | $ | 121,865,000 |
| Unfunded | | 277,985,000 | | 286,897,000 |
| Total | $ | 394,031,000 | $ | 408,762,000 |

104.    According to the Amended 2Q19 10-Q, the material weaknesses in CPI's internal control over financial reporting identified in the Amended 1Q19 10-Q also existed as of June 30, 2019 and June 30, 2018.

105.    The amended Form 10-Q for the period ended September 30, 2019 (the "Amended 3Q19 10-Q") contained the restated results for the three months ended September 30, 2019 and 2018, reflecting that CPI had incurred a net loss, rather than net income, for both periods. Specifically, for the period ended September 30, 2018, revenue had been overstated by $3,174,691 (20%), cost of sales had been understated by $121,228, and gross profit had been overstated by $3,295,919 (573%).  For the period ended September 30, 2019, revenue had been overstated by $3,021,391 (13.32%), cost of sales had been understated by $9,584, and gross profit had been overstated by $2,935,509 (156.87%).  With respect to the balance sheet, as of September 30, 2019, CPI's contract assets had been overstated by $106,971,069 (738%), its contract liabilities had been overstated by $45,106, and its loss reserve had been understated by $2,678,439 (92.51%). The Company explained:

*Revenue*

Revenue for the three months ended September 30, 2019 was $22,689,762 (restated) compared to $15,842,610 (restated) for the same period last year, an increase of $6,847,152 or 43.2%. The majority of this increase is the result of the

inclusion of WMI revenue, which we acquired in December of 2018, and in increase in revenue from our E-2D wing Panel kitting programs.

*    *    *

### Cost of sales

Cost of sales for the three months ended September 30, 2019 and 2018 was $20,757,649 (restated) and $15,267,308 (restated), respectively, an increase of $5,490,341 or 36%, This increase is the result of a 43.2% increase in revenue from the year-ago period indicative of improved margins.

*    *    *

### Gross Profit

Gross profit for the three months ended September 30, 2019 was $1,932,113 (restated) compared to $575,302 (restated) for the three months ended September 30, 2018, an increase of $1,356,811 or 236%, primarily the result of higher volume. Gross profit percentage three months ended September 30, 2019 was 8.5% (restated) compared to 3.6% (restated) for the three months ended September 30, 2018.

*    *    *

### Net Loss

Net loss for the three months ended September 30, 2019 was ($1,255,051) (restated) or ($0.11) per basic share, compared to a loss of ($2,524,326) (restated) or ($0.28) per basic share, for the same period last year. Diluted loss per share was ($0.11) for the three months ended September 30, 2019 calculated utilizing 11,838,862 (restated) weighted average shares outstanding. Diluted loss per share was ($0.28) for the three months ended September 30, 2018 calculated utilizing 8,952,979 (restated) weighted average shares outstanding.

106.    The Amended 3Q19 10-Q also showed that backlog had been overstated by $10,576,000 (2%) for third quarter 2019.  Specifically, the Company stated:

| Backlog (Total) | September 30, 2019 (restated) | | December 31, 2018 (restated) |
|---|---|---|---|
| Funded | $ | 153,374,000 | $    121,865,000 |
| Unfunded | | 369,955,000 | 286,897,000 |
| Total | $ | 523,329,000 | $    408,762,000 |

107.   According to the Amended 3Q19 10-Q, the material weaknesses in CPI's internal control over financial reporting identified in the Amended 1Q19 10-Q also existed as of September 30, 2019 and September 30, 2018.

108.   The Company also filed its 2019 10-K within which it restated the financial statements for the year ended December 31, 2018.  Specifically, for the year ended December 31, 2018, revenue had been overstated by $13,563,254 (19.28%), cost of sales had been understated by $390,979, and gross profit had been overstated by $14,234,376 (331.4%).   The Company further explained:

> **Revenue.** Revenue for the year ended December 31, 2019 was $87,518,688 compared to $70,366,016 (restated) for the same period last year, representing an increase of $17,152,672. The majority of our revenue growth was contributed by our WMI subsidiary that was acquired in December 2018 and had immaterial revenue in 2018. Organic revenue growth during 2019 was approximately 7% driven primarily by increases in our E-2D kitting programs with Northrop Grumman, the NGJ-MB pod program with Raytheon and our advanced missile wing contract with Raytheon that was a new start in 2019. Growth in these and other programs was partially offset by a decrease in revenue from our Gulfstream G650 fixed leading edge program with Triumph Group, our Pacer Classic III Phase 2 program with USAF as this effort transitions to Phase 3, and our AH-1Z engine inlet contract with Bell Helicopter.
>
> \*       \*       \*
>
> **Cost of sales.** Cost of sales for the years ended December 31, 2019 and 2018 was $78,386,997 and $66,155,986, respectively, an increase of $12,231,011 or 18%.
>
> \*       \*       \*
>
> **Gross profit.** Gross profit for the year ended December 31, 2019 was $9,131,691 compared to $4,210,030 for the year ended December 31, 2018, an increase of $4,921,661. Gross profit percentage ("gross margin") for the year ended December 31, 2019 was 10.4% compared to 6% for the same period last year. The majority of the increase was from our WMI subsidiary that was acquired in December 2018 and had immaterial gross profit in 2018. Organic growth was primarily from our E2-D programs kitting programs, partially offset by a decrease in gross profit on our Pacer Classic III Phase 2 program with USAF as this effort transitions to Phase 3.
>
> \*       \*       \*

### *Loss from operations*

We had a loss from operations for the year ended December 31, 2019 of ($2,433,090) compared to a loss from operations of ($5,569,997) (restated) for the year ended December 31, 2018. This was primarily the result of the income generated by our WMI subsidiary which was acquired in December 2018, as well as, favorable sales mix more weighted to higher margin military products.

109.    With respect to the balance sheet, as of December 31, 2018, CPI's contract assets had been overstated by $95,744,625 (544%), its contract liabilities had been understated by $1,664,079 (27%), and its loss reserve had been understated by $3,446,952.  Additionally, rather than retained earnings of approximately $22.7 million, CPI had an accumulated deficit of $74,596,536.

110.    The 2019 10-K also showed that backlog had been overstated by $48,618,000 (11.89%) for the year ended December 31, 2018.  Specifically, the Company stated:

| Backlog (Total) | December 31, 2019 | | December 31, 2018 (restated) | |
|---|---|---|---|---|
| Funded | $ | 147,647,000 | $ | 121,865,000 |
| Unfunded | | 414,231,000 | | 286,897,000 |
| Total | $ | 561,878,000 | $ | 408,762,000 |

111.    According to the 2019 10-K, the material weaknesses in CPI's internal control over financial reporting identified in the Amended 1Q19 10-Q also existed as of December 31, 2019 and December 31, 2018.

112.    The 2019 10-K contained an adverse opinion on internal control over financial reporting by CPI's auditor.  Specifically, the auditor's report stated:

**Adverse Opinion on Internal Control Over Financial Reporting**

We have audited CPI Aerostructures, Inc. and Subsidiaries' (the Company's) internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control—Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, because of the effect of the material weaknesses described in the following paragraph on the achievement of the objectives of the control criteria, the

44

Company has not maintained effective internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by COSO.

A material weakness is a control deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment.

- The Company did not maintain an effective control environment, risk assessment, control activities and monitoring based on the criteria established in the COSO framework and identified deficiencies in the principles associated with the control environment of the COSO framework. Specifically, control deficiencies constituted material weaknesses, either individually or in the aggregate, relating to (1) management's ineffective execution of its strategy to attract, develop, and retain individuals with an appropriate level of knowledge, experience and training in financial reporting; (2) management's lack of sufficient technical proficiency to provide adequate oversight of accounting and financial reporting, and; (3) the Company's insufficient documented accounting policies and procedures. These control deficiencies resulted in material errors and the restatement of previously issued consolidated financial statements.

- The Company did not have adequate controls over accounting for revenue recognition, specifically, the Company lacked controls to ensure that the period of performance or values of the accounting contracts were properly determined and controls to ensure revenue was constrained.

- The Company did not have controls over accounting for significant, nonroutine, complex transactions.

- The Company did not have effective information technology general controls, specifically, the Company's lack of testing and documenting the areas of access to programs and data, program change-management and computer operations.

These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2019 consolidated financial statements, and this report does not affect our report dated August 25, 2020, on those consolidated financial statements.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets and the related consolidated statements of operations and comprehensive loss, stockholders' equity (deficit) and cash flows of the Company, and our report

dated August 25, 2020 expressed an unqualified opinion thereon, and included explanatory paragraphs for changes in accounting principles and a restatement of previously issued consolidated financial statements.

### 3.     The SEC Commences an Investigation

113.    CPI also revealed that the SEC had commenced an investigation in connection with

the Restatement, among other things.  Specifically, on August 25, 2020 the Company disclosed:

**SEC Investigation**

On May 22, 2020, the Company received a letter (the "SEC Letter") from the SEC Division of Enforcement (the "Division") indicating that the Division staff is conducting an investigation involving the Company. The SEC Letter states that the investigation is a non-public, fact finding inquiry where the Division staff is trying to determine whether there have been any violations of federal securities laws. As part of this investigation, the Division issued a subpoena to the Company seeking documents and information relating, among other things, to previously-disclosed errors in and restatements of, the Company's financial statements, the Company's October 16, 2018 equity offering and the recent separation of the Company's former Chief Financial Officers.

### F.     The Errors in the Financial Statements Caused Harm to CPI

### 1.     Executive Officers Received Excessive Compensation on the Basis of False Financial Statements

114.    For fiscal 2018, defendants McCrosson and Palazzolo received cash bonuses for

hitting certain growth targets, including revenue and pre-tax income.  The Restatement shows that

CPI should have reported losses for fiscal 2018.  Therefore, the Company's performance does not

support the bonuses that McCrosson and Palazzolo received.

115.    On April 30, 2019, defendants McCrosson, Stinson, Bond, Cooper, Faber, Paulick,

and Rosenfeld caused CPI to issue a definitive proxy statement soliciting stockholder votes in

advance of the Company's Annual Meeting of Stockholders to be held June 13, 2019 (the "Proxy

Statement").  In the Proxy Statement, these eight defendants solicited stockholder votes in favor

of three management proposals, including: (i) a proposal to elect Cooper, Bond, Faber, and

McCrosson to new terms as directors of the Company; (ii) a proposal to approve the executive

compensation of NEOs; and (iii) a proposal to ratify the appointment of CPI's independent auditor.

116. The Proxy Statement disclosed that the Board had determined that McCrosson is

not independent.

117. Regarding corporate governance with respect to fiscal 2018 financial statements,

the Proxy Statement stated, in relevant part:

> Management has reviewed the audited financial statements in the Company's
> Annual Report on Form 10-K for the year ended December 31, 2018 with our Audit
> Committee, including a discussion of the quality, not just the acceptability, of the
> accounting principles, the reasonableness of significant accounting judgments and
> estimates, and the clarity of disclosures in the financial statements. In addressing
> the quality of management's accounting judgments, members of our Audit
> Committee asked for management's representations and reviewed certifications
> prepared by the Chief Executive Officer and Chief Financial Officer that the
> unaudited quarterly and audited annual financial statements of the Company fairly
> present, in all material respects, the financial condition and results of operations of
> the Company.

118. Regarding compensation determinations, the Proxy Statement stated:

> Our board of directors has adopted a written Compensation Committee charter,
> which is reviewed annually and which the Compensation Committee intends to
> review at its next regularly scheduled meeting. The responsibilities of our
> Compensation Committee include:

> - establishing the general compensation policy for our executive officers,
>   including the Chief Executive Officer;

> - reviewing the compensation paid to non-executive directors and making
>   recommendations to the board of directors for any adjustments;

> - administering our stock option and performance equity plans and
>   determining who participates in the plans, establishing performance goals,
>   if any, and determining specific grants and bonuses to the participants; and

> - ensuring that any compensation plan for key executives does not encourage
>   undue risk-taking.

> Our Compensation Committee held four meetings during 2018 to review, discuss,
> and make any necessary changes to our executive and non-executive director
> compensation. Our Compensation Committee makes all final determinations with

respect to compensation of executive officers, considering, among other things, its assessment of the value of each executive officer's contribution to the Company, the Company's financial performance during recent fiscal years in light of prevailing business conditions, and the Company's goals for the ensuing fiscal year. Our Compensation Committee considers recommendations from our Chief Executive Officer relating to the compensation of our other executive officers.

119.    Regarding non-employee director compensation, the Proxy Statement informed stockholders that defendant Rosenfeld received $102,575 in compensation from CPI for his service on the Board during the 2018 fiscal year.  Moreover, defendants Stinson and Bazaar received $66,960 each and defendants Paulick, Faber, and Bond received $24,750 each in non-employee director compensation.

120.    As to the compensation of defendants McCrosson and Palazzolo, the Proxy Statement stated that "[a]s a matter of policy, the Compensation Committee has decided to take into consideration the results of the most recent Say on Pay vote when making compensation decisions and reviewing its compensation policies and practices."

121.    The Proxy Statement disclosed that, in addition to his base salary of $365,761, defendant McCrosson was entitled to receive non-discretionary performance-based cash bonuses based upon CPI's achievement of growth targets measured by pre-tax income, return on invested capital, free cash flow, and revenue.  As a result, "[f]or the year ended December 31, 2018, Mr. McCrosson received $135,215 in performance-based cash compensation . . . [and] an aggregate of 33,251 shares of restricted stock (with a fair market value on the date of grant of $274,320) pursuant to the Company's 2016 long-term incentive plan."

122.    Similarly, the Proxy Statement disclosed that, in addition to his base salary of $268,048, defendant Palazzolo "received $53,697 in performance-based cash compensation . . . [and] an aggregate of 13,002 shares of restricted stock (with a fair market value on the date of grant of $107,267) pursuant to the Company's 2016 long-term incentive plan."

123.    On June 17, 2019, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the Proxy Statement.   In particular: (i) McCrosson, Bond, Faber, and Cooper were reelected to terms as directors; and (ii) the compensation of defendants McCrosson and Palazzolo was approved by stockholders.

### 2.    Amendment to BankUnited Credit Facility

124.    On August 24, 2020, CPI filed a Form 8-K with the SEC, disclosing that the errors in its financial statements and the internal control weaknesses "caused [the Company] to be in violation of certain financial and non-financial covenants under the BankUnited Facility as of and after March 31, 2018."  Although the lender, BankUnited, N.A. ("BankUnited"), agreed to waive certain covenant violations and agreed not to test CPI's compliance with financial covenants for the first half of 2020, the Company was forced to enter into an amended credit agreement under which $6 million was converted from a revolving loan to a term loan.  Specifically, CPI stated:

> On August 24, 2020, CPI Aerostructures, Inc. (the "Company") entered into a Sixth Amendment and Waiver ("Sixth Amendment") to that certain Amended and Restated Credit Agreement with the Lenders named therein and BankUnited, N.A. ("BankUnited") as Sole Arranger, Agent and a Lender, dated as of March 24, 2016 (as amended from time to time, the "Credit Agreement"). In connection with the Sixth Amendment, the Company and BankUnited, N.A. also amended the Amended and Restated Revolving Credit Note, dated as of March 24, 2016, which prior to the amendment represented an aggregate principal commitment amount of $30 million ("Revolving Note") and the Amended and Restated Term Note, dated as of March 24, 2016, with an original principal amount before the amendment of $10 million ("Term Note").

> Under the Sixth Amendment, and the related amendments to the Revolving Note and Term Note, an aggregate of $6 million of the outstanding balance under the Revolving Note was converted into and added to the outstanding balance on the Term Note. ***The availability under the Revolving Note was permanently reduced by $6 million, to $24 million, and the outstanding principal amount on the Term Note was increased to approximately $7,933,333.***

125.    Prior to the Sixth Amendment, the BankUnited Facility required CPI "to maintain the following financial covenants: (1) maintain a debt service coverage ratio at the end of each

quarter for the trailing four quarter period of no less than 1.5 to 1.0, (2) maintain a minimum net income, after taxes, of no less than $1.00, (3) maintain a maximum leverage ratio at the end of each quarter for the trailing four quarter period of no more than 3.0 to 1.0, and (4) maintain a minimum adjusted EBITDA at the end of each quarter of no less than $2 million."

126.    The Sixth Amendment changed the financial covenants as follows:

Additionally, under the Sixth Amendment, the parties amended the Credit Agreement by (i) extending the maturity date of the Revolving Note and Term Note to May 2, 2022, and making conforming changes to the payment schedule on the Term Note, (ii) amending the fixed charge coverage ratio covenant by requiring the ratio to be quarterly for September 30, 2020 and December 31, 2020 and then determined on a trailing twelve-month basis beginning on March 31, 2021, (iii) waiving the leverage covenant noncompliance for each quarter ended during the period from March 31, 2018 through December 31, 2019. The leverage covenant will not be tested for the four quarters from March 31, 2020 through December 31, 2020. Then beginning with the quarter ending March 31, 2021, the funded debt to EBITDA ratio shall be 4.0:1.0, tested on a trailing four quarter basis, (iv) reducing the minimum quarterly EBITDA covenant from $2 million to $1 million beginning on September 30, 2020, (v) maintaining a minimum net income, after taxes, of no less than $1.00 and (vi) replacing the interest pricing grid for the Revolving Note with an interest rate for Eurodollar loans of LIBOR plus 3.25% with a floor of 50 basis points or an interest rate for base rate loans equal to BankUnited's prime rate plus 0.25%.

127.    Moreover, the interest rate for the BankUnited Facility had last been amended by the Third Amendment dated August 15, 2018, which provided:

"**Applicable Margin**": means, from time to time with respect to Revolving Credit Loans and Term Loans and the fees payable under Section 3.5(a), the following percentages per annum, adjusted quarterly based upon the Borrower's Maximum Leverage Ratio for the fiscal quarter then-ended (the "**Financial Covenant**") as set forth in the most recent Compliance Certificate received by Administrative Agent pursuant to Section 6.2(a):

| Pricing Level | Leverage Ratio | Eurodollar Rate Margin | Base Rate Margin | Commitment Fee |
|---|---|---|---|---|
| 1 | ≥ 2.75x | 3.25% | 0.75% | 0.50% |
| 2 | ≥ 2.00x < 2.75x | 3.00% | 0.50% | 0.50% |
| 3 | ≥ 1.00x; < 2.00x | 2.75% | 0.50% | 0.50% |
| 4 | < 1.00x | 2.50% | 0.50% | 0.50% |

128.     The Sixth Amendment replaced the above definition of "Applicable Margin" as follows:

> "**Applicable Margin**": means, from time to time with respect to Revolving Credit Loans and Term Loans and the fees payable under Section 3.5(a), the following percentages per annum:

| Eurodollar Rate Margin | Base Rate Margin | Commitment Fee |
|---|---|---|
| 3.25% | 0.75% | 0.50% |

129.     In sum, the errors in CPI's financial statements caused the Company to convert $6 million from a revolving loan to a term loan and to repay the loans at a fixed interest rate, rather than one contingent on CPI's leverage ratio.

## VI.     DAMAGES TO THE COMPANY

130.     As a direct and proximate result of the Individual Defendants' conduct, CPI has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

    (a)     Legal and professional fees incurred in connection with the Restatement and the remediation of deficiencies in CPI's internal control over financial reporting;

    (b)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to CPI;

    (c)     Less flexible terms with respect to the BankUnited Facility, including regarding associated interest expenses;

    (d)     Costs incurred in connection with the SEC Investigation;

    (e)     Legal fees incurred in connection with the Securities Class Action; and

    (f)     Any funds paid to settle the Securities Class Action and/or any SEC action.

131.     In addition, CPI's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted

the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

132.    The actions complained of herein have irreparably damaged CPI's corporate image and goodwill.  For at least the foreseeable future, CPI will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that CPI's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

133.    Plaintiff brings this action derivatively in the right and for the benefit of CPI to redress injuries suffered, and to be suffered, by CPI as a direct result of breaches of fiduciary duty by the Individual Defendants, violations of Section 10(b) of the Exchange Act, and unjust enrichment.  CPI is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

134.    Plaintiff will adequately and fairly represent the interests of CPI in enforcing and prosecuting its rights.

135.    Plaintiff has continuously been a shareholder of CPI at times relevant to the wrongdoing complained of and is a current CPI shareholder.

136.    When this action was filed, CPI's Board of Directors consisted of seven directors: defendants McCrosson, Stinson, Bond, Cooper, Faber, Paulick, and Rosenfeld.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**A.      Demand is Excused Because There is Reason to Doubt a Majority of the Board Acted in Good Faith**

**1.      A Majority of the Board Knew of ASC 606 and the Need for Internal Controls Related to it Since 2014**

137.    At all relevant times, the Company's proxy statements have affirmed that "[t]he primary function of our board of directors is oversight. Our board of directors as a whole has responsibility for risk oversight and reviews management's risk assessment and risk management policies and procedures."

138.    Since 2014, defendants McCrosson, Rosenfeld, Paulick, Stinson, and Faber, five of the current seven directors, have known of ASC 606 and that CPI would imminently be required to adopt it.  For example, the Company's 2014 10-K filed with the SEC on March 6, 2015, which was signed by McCrosson, Rosenfeld, Paulick, Stinson, and Faber, disclosed the following about the new revenue recognition standard:

Recent Accounting Pronouncements

In May 2014, the FASB issued Accounting Standards Update No. 2014-09 (ASU 2014-09), Revenue from Contracts with Customers (Topic 606) , which requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. ***ASU 2014-09 will replace most existing revenue recognition guidance in U.S. GAAP*** when it becomes effective. The new standard is effective for annual and interim periods in fiscal years beginning after December 15, 2016. Early application is not permitted. ASU 2014-09 is effective for our first quarter of fiscal year 2017 using either the retrospective or cumulative effect transition method. ***We are evaluating the effect that ASU 2014-09 will have on our financial statements and related disclosures. We have not yet selected a transition method nor have we determined the effect of the standard on our ongoing financial reporting***.

139.    Thus, as of March 2015, McCrosson, Rosenfeld, Paulick, Stinson, and Faber knew that CPI would be required to adopt ASC 606 by the first quarter of fiscal 2017 and, reflecting that they understood the new standard would require changes to CPI's revenue recognition, they

assured shareholders that management was evaluating the effect of the new standard on CPI's financial statements and disclosures.

140.    One year later, the same five current directors, McCrosson, Rosenfeld, Paulick, Stinson, and Faber, signed CPI's 2015 10-K and caused the Company to file it with the SEC on March 28, 2016.  In the 2015 10-K, they stated the following regarding ASC 606:

Recent Accounting Pronouncements

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update No. 2014-09 ("ASU 2014-09"), Revenue from Contracts with Customers (Topic 606) , which requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. ***ASU 2014-09 will replace most existing revenue recognition guidance in U.S. GAAP when it becomes effective***. In April of 2015, the FASB proposed deferring the effective date of ASU 2014-09 for one year, and proposed some modifications to the original provisions. On July 9, 2015, the one year deferral of the effective date was approved, and as such ASU 2014-09 is effective for our first quarter of fiscal year 2018 using either the retrospective or cumulative effect transition method. ***We are evaluating the effect that ASU 2014-09 will have on our financial statements and related disclosures.  We have not yet selected a transition method nor have we determined the effect of the standard on our ongoing financial reporting***.

141.    Thus, in March 2016, McCrosson, Rosenfeld, Paulick, Stinson, and Faber reiterated to shareholders the impending adoption of ASC 606 and, further supporting that they knew of the need for internal controls related to the new standard, again represented to shareholders that management was evaluating the effect of the new standard on CPI's financial statements and disclosures.  The above disclosure differed from the disclosure issued in the 2014 10-K one year earlier by accurately stating that the adoption date for the new standard had been deferred for an additional year.

142.    On March 8, 2017, the same five current directors, McCrosson, Rosenfeld, Paulick, Stinson, and Faber, now joined by defendant Bond, signed CPI's 2016 Form 10-K and caused the

Company to file it with the SEC.  In the 2016 Form 10-K, they stated the following regarding ASC

606:

> Recent Accounting Pronouncements
>
> In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update No. 2014-09 ("ASU 2014-09"), Revenue from Contracts with Customers (Topic 606), which requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. ***ASU 2014-09 will replace most existing revenue recognition guidance in U.S. GAAP when it becomes effective***. In April 2015, the FASB proposed deferring the effective date of ASU 2014-09 for one year, and proposed some modifications to the original provisions. On July 9, 2015, the one year deferral of the effective date was approved and, as such, ASU 2014-09 is effective for the first quarter of fiscal year 2018 using either the retrospective or cumulative effect transition method. ***The Company is evaluating the effect that ASU 2014-09 will have on its financial statements and related disclosures. The Company has not yet selected a transition method nor have they determined the effect of the standard on its ongoing financial reporting, but it expects to determine the effect in the second quarter of 2017***.

143.    Thus, in March 2017, McCrosson, Rosenfeld, Paulick, Stinson, and Faber, now

joined by Bond, reiterated for the third time to shareholders the impending adoption of ASC 606

and again represented to shareholders that management was evaluating the effect of the new

standard on CPI's financial statements and disclosures.  The disclosure issued in the 2016 10-K

was different from the disclosures in the previous two years' Forms 10-K in that the new disclosure

provided a date by which the Company expected to determine the effect of the new standard: "the

second quarter of 2017."  When the 2016 10-K was filed, the second quarter of 2017 was no more

than a few months in the future.

144.    On March 22, 2018, McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond

signed the Company's 2017 10-K and caused CPI to file it with the SEC.  The complete disclosure

in the 2017 10-K regarding the Company's adoption of ASC 606 is excerpted *supra*, ¶ 39.  In the

2017 10-K, ASC 606 is described under the heading "Critical Accounting Policies," signifying

that the standard had been adopted by CPI.  In the 2017 10-K, these six current directors disclosed

that the Company had adopted Topic 606 and was "using the modified retrospective method for all of its contracts."  These six directors also stated that "[f]ollowing the adoption of Topic 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice," and told shareholders that due to adoption of the standard, the Company would change the presentation of its balance sheet.

145.    Clear from the disclosures in the Company's 2017 10-K is that defendants McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond knew of the importance of the Company's revenue recognition policies, knew the that the new standard was required to have been adopted, and knew that the new standard was different from the previous standard.  Notably, in the 2017 10-K, McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond disclosed that CPI's revenue recognition practices were consistent with its historical practice, even though the new standard had been adopted.   In light of the subsequent Restatement and admitted material weaknesses to internal controls, when McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond issued the 2017 10-K, they either: (i) stated that revenue recognition under ASC 606 was consistent with past practice without knowing if that was true; or (ii) knew it was untrue and signed the 2017 10-K anyway.  In either case, subsequent events raise a reason to doubt that McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond acted in good faith when they disclosed that CPI's revenue recognition under ASC 606 was consistent with historical practice.

### 2.    A Red Flag is Waved Before McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond

146.    In December 2018,  approximately nine months after filing the of the Company's 2017 10-K, these same six defendants who were required by their fiduciary duties to be monitoring the Company's application of the new revenue guidance and its related internal controls, were presented with a red flag.  Having filed its third quarter 2018 10-Q on November 13, 2018, the

Company admitted in February 2019 that it would be required to restate its previously reported revenue for the three and nine months ended September 20, 2018. *See,* ¶ 59 *supra*.

147.   As a result, on April 1, 2019, when defendants McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond signed and filed the Company's 2018 10-K, they knew that CPI "did not design and maintain adequate review controls," leading to an overstatement of revenue. Nevertheless, they again told shareholders that the Company had adopted ASC 606 and that its revenue recognition practices under the new standard were the same as CPI's historical practice. In light of the material weakness disclosed in February 2019 and the subsequent Restatement in July 2020, when McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond issued the 2018 10-K, they either: (i) stated that the new revenue recognition was consistent with past practice without knowing whether that was true; or (ii) knew the statement was untrue and signed the 2018 10-K anyway.   In either case, there is reason to doubt that McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond acted in good faith when they issued the 2018 10-K.

148.   As of April 1, 2019, defendants McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond knew: (i) the Company had recently adopted a new revenue recognition standard that "replaced most existing" GAAP revenue guidance; (ii) internal controls were required by law and necessary to the accurate reporting of revenue; and (iii) the Company's revenue for the first nine months of 2018 had been misstated due to a material weakness to the Company's internal controls over disclosure and financial reporting.   However, they claimed to have quickly identified and remediated the internal control deficiency after identifying a limited problem.   These six defendants either (i) declined to conduct the inquiry necessary to establish the true extent of deficient material controls at CPI; or (ii) knew that CPI lacked meaningful controls over financial

reporting and its previously issued revenue results were also inaccurate, but decided not disclose the extent of the problem to avoid expanding the scope of the 2019 restatement.

149.    Instead, McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond allowed the Company to report strong results for the first three quarters of 2019. For example, each quarterly gross profit result was better than the same quarter of 2018. As was subsequently revealed, the Company's internal controls over financial reporting and disclosure were pervasively deficient and in reality, gross profit for each quarter of 2019 was *lower* than the same period of the previous year.

150.    In the Restatement announced in July 2020, the Company's independent auditor identified four areas of deficient internal controls: (i) lack of effective control environment, risk assessment, control activities and monitoring; (ii) lack of adequate controls over accounting for revenue recognition; (iii) *no controls at all* over accounting for significant, nonroutine, complex transactions; and (iv) ineffective information technology general controls.

151.    Accordingly, these six defendants not only presided over a pervasively lack of meaningful internal controls at CPI generally, they also specifically failed to ensure that the Company had adequate controls over revenue recognition even though they had known since 2015 that ASC 606 would replace existing GAAP revenue recognition practices. At various times in the years leading up to the adoption ASC 606, McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond represented that the Company was "evaluating" the impact of the new standard, reflecting that they understood the standard would have an impact on CPI's revenue recognition. Once the standard was adopted, they affirmatively stated multiple times that the new standard had no effect on past revenue recognition practices. Having previously stated that the they were evaluating the impact of the standard, the reasonable inference is that either they never actually

evaluated the impact of ASC 606 or they knew that, as later emerged, the assertion that ASC 606 resulted in the same revenue recognition as the Company's historical practices was false.

152.    Further, the scale of the errors caused by their failure to oversee the necessary controls to adopt 606 is enormous, as detailed above.  The Company restated seven quarterly and one annual report issued over the course of approximately two years.  In 2018 the Company overstated its gross profit by *more than 300%*.  While defendants were telling investors that CPI was performing better in 2019 than it had in 2018, in fact the opposite was true.  The errors completely misrepresented trends in CPI's performance and the financial condition of the Company.  Far from an easily remediable discrete issue, as they claimed in early 2019, the Company's lacked meaningful internal controls over revenue recognition to the point that its results of operations were wildly inaccurate.

153.    Due to the foregoing, and as set forth below, ample reason exists to doubt that McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond acted in good faith when they allowed the Company to adopt a major new accounting standard without any meaningful internal controls over the related accounting and financial disclosures.  Likewise, reason exists to doubt that McCrosson, Rosenfeld, Paulick, Stinson, Faber, and Bond acted in good faith when they issued, over the course of years, repeated disclosures assuring investors that they were evaluating the impact of the new revenue recognition standard, and, once implemented, that the Company's revenue recognition practices under ASC 606 were consistent with its historical practice.

### B.    Additional Reasons Demand is Excused

#### 1.    McCrosson is Not Disinterested

*McCrosson*

154.    At all relevant times, McCrosson was the Company's CEO and President, and therefore was not independent under NYSE listing rules.  As an employee, McCrosson derives

substantially all of his income from his employment with CPI, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis. Moreover, as CEO and as alleged herein, McCrosson personally issued the misleading statements alleged herein and received $135,215 cash bonus on the basis of false financial statements for fiscal 2018. As a result, McCrosson would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

155.    McCrosson similarly will not sue defendant Palazzolo, his CFO during the relevant period.   Suing Palazzolo would effectively be conceding that McCrosson had also issued misleading statements and should be sued as well.

## 2.    Reason Exists to Doubt the Audit Committee Members Acted in Good Faith

### *Cooper*

156.    Cooper served as a member of the Audit Committee since April 2019.  As such, she is responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  When Cooper joined the Audit Committee, she did so as the Company was restating its revenue results for the first nine months and third quarter of 2019.  Cooper therefore actually knew that the Company's internal controls over financial reporting were deficient when she became an Audit Committee member.  In her capacity as an Audit Committee member, Cooper reviewed and approved the disclosures regarding the Company's financial statements, including with respect to revenue recognition and CPI's internal control over financial reporting.  As alleged herein, Cooper failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in CPI's SEC filings and other disclosures.  Thus, it is substantially likely that Cooper

breached her fiduciary duties and reason exists to doubt that she could disinterestedly consider a demand for action in connection with the foregoing.   Demand is excused as to her.

   *Paulick*

   157.   Paulick served as a member of the Audit Committee at all relevant times.   Thus, demand is excused as to him for substantially the same reasons as set forth in ¶ 156, *supra*.

   158.   Moreover, Paulick served as a member of the Audit Committee when ASC Topic 606 was introduced in 2014, thus, he knew or should have known of the impact of the "significant change" in accounting principles based on an evaluation with management, CPI's auditor, and relevant authorities.

   159.   Indeed, the FASB and the International Accounting Standards Board formed the Joint Transition Resource Group for Revenue Recognition ("TRG") to help entities implement the accounting standard, solicit and discuss questions arising from implementing ASC Topic 606, inform company boards about implementation issues to recommend action as needed, and provide a forum to learn about the guidance.

   160.   The Deputy Chief Accountant for the SEC advised companies to consult the SEC if an entity  reached a different conclusion on the application of ASC Topic 606 than that reached by the TRG.

   161.   In addition, the American Institute of Certified Public Accountants ("AICPA") formed sixteen industry task forces, including an aerospace industry task force, to address industry-specific implementation questions relating to ASC Topic 606.   The AICPA also issued a new accounting and auditing guide on revenue recognition in January 2017.

   162.   The Company had four years to evaluate and disclose the impact ASC 606 would have on its future financial statements prior to its adoption. As a member of the Audit Committee,

Paulick was involved in these preparations if they occurred.  Thus he had reason to know that CPI had ineffective controls with respect to revenue recognition.  With the benefit of the guidance from the TRG, SEC, and AICPA, among others, Paulick knew or should have known that the performance obligation, rather than the "use of a manufacturing program," is the appropriate use of accounting under ASC Topic 606 and that CPI lacked internal controls to identify the performance obligation for its contracts.  Therefore, Paulick intentionally or recklessly disregarded the accuracy of CPI's financial statements and the integrity of its internal control over financial reporting.  Thus, it is substantially likely that Paulick breached his fiduciary duties and reason exists to doubt that he could disinterestedly consider a demand for action in connection with the foregoing.   Demand is excused as to him.

*Faber*

163.    Faber has served as a member of the Audit Committee since 2013, thus demand is excused as to him for substantially the same reasons set forth in ¶¶ 156-162, *supra*.

164.    Additionally, the Proxy Statement identifies Faber as the Audit Committee Financial Expert.  An "Audit Committee Financial Expert" is a person who has the following attributes: "an understanding of generally accepted accounting principles and financial statements; the ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves; experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that can reasonably be expected to be raised by the registrants' financial statements, or experience actively supervising one or more persons engaged in such activities; an understanding of internal controls and procedures for financial reporting; and an understanding of audit committee functions."[4]

---

[4] https://www.sec.gov/rules/final/33-8177.htm

Therefore, Faber purports to be knowledgeable about the application of GAAP, which includes ASC Topic 606, so he knew or should have known that CPI's revenue recognition policy did not comply with GAAP

165.    Thus, it is substantially likely that Faber breached his fiduciary duties and reason exists to doubt that he could disinterestedly consider a demand for action in connection with the foregoing.   Demand is excused as to him.

166.    For the foregoing reasons, demand is excused as to a majority of the Board in connection with all counts for the reasons set forth above.  Regarding Counts I and II, defendants Stinson, Bond, Cooper, Faber, Paulick, and Rosenfeld will not take action against themselves or McCrosson and Palazzolo because doing so would concede that culpable wrongdoing had occurred where the Board had failed to implement meaningful controls over revenue recognition. McCrosson will not take action against any of Stinson, Bond, Cooper, Faber, Paulick, and Rosenfeld because they control his compensation and taking action against them would acknowledge that he had issued misleading statements regarding the Company's internal controls. Regarding Counts III and IV, Stinson, Bond, Cooper, Faber, Paulick, and Rosenfeld will not take action against McCrosson and Palazzolo for substantially the same reasons: doing so would acknowledge that misleading statements were issued and that the Board awarded excess compensation.

167.    Accordingly, a majority of the Board faces a substantial likelihood of liability due to its failure to institute adequate internal controls over revenue recognition notwithstanding that it actually knew for six years that CPI was require to adopt ASC 606 and that ASC 606 would replace most existing GAAP revenue recognition guidance.  Additionally, reason exists to doubt that a majority of the Board acted in good faith when, while it was failing to require CPI to adopt

the necessary internal controls, it issued repeated disclosures assuring investors that the Board was overseeing the transition to ASC 606, was evaluating its impact, and that the new standard resulted in no deviation from CPI's historical practice of revenue recognition. For these reasons, demand is excused as to the entire Board.

## COUNT I

**Against Defendants McCrosson and Palazzolo for Breach of Fiduciary Duty**

168. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169. Defendants McCrosson and Palazzolo each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CPI's business and affairs, particularly with respect to issues as fundamental as public disclosures.

170. Defendants McCrosson's and Palazzolo's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. Defendants McCrosson and Palazzolo intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CPI.

171. In breach of their fiduciary duties owed to CPI, defendants McCrosson and Palazzolo willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

172. In particular, defendants McCrosson and Palazzolo knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

173. As a direct and proximate result of the breaches of their fiduciary obligations by defendants McCrosson and Palazzolo, CPI has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and

a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against Defendants Stinson, Bond, Cooper, Faber, Paulick, Rosenfeld, and Bazaar for Breach of Fiduciary Duty

174.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175.    Defendants Stinson, Bond, Cooper, Faber, Paulick, Rosenfeld, and Bazaar each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CPI's business and affairs, particularly with respect to issues as fundamental as public disclosures.

176.    The conduct of defendants Stinson, Bond, Cooper, Faber, Paulick, Rosenfeld, and Bazaar set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants Stinson, Bond, Cooper, Faber, Paulick, Rosenfeld, and Bazaar intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CPI.

177.    In breach of their fiduciary duties owed to CPI, defendants Stinson, Bond, Cooper, Faber, Paulick, Rosenfeld, and Bazaar willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

178.    In particular, defendants Stinson, Bond, Cooper, Faber, Paulick, Rosenfeld, and Bazaar knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

179.    As a direct and proximate result of the breaches of their fiduciary obligations by defendants Stinson, Bond, Cooper, Faber, Paulick, Rosenfeld, and Bazaar, CPI has sustained and continues to sustain significant damages.  Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT III

### Against McCrosson and Palazzolo for Contribution
### for Violations of Sections 10(b) and 21D of the Exchange Act

180.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181.    Defendants McCrosson and Palazzolo are named as defendants in related securities class actions. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

182.    CPI is named as a defendant in related securities class actions that allege and assert claims arising under §10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If CPI is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

183.    As officers, directors and otherwise, defendants McCrosson and Palazzolo had the power or ability to, and did, control or influence, either directly or indirectly, CPI's general affairs,

including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5.

184.    Defendants McCrosson and Palazzolo are liable under §21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

185.    Defendants McCrosson and Palazzolo have damaged the Company and are liable to the Company for contribution.

186.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

<u>**COUNT IV**</u>

**Against McCrosson and Palazzolo for Unjust Enrichment**

187.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

188.    By their wrongful acts and omissions, defendants McCrosson and Palazzolo were unjustly enriched at the expense of and to the detriment of CPI.  Defendants McCrosson and Palazzolo were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to CPI.

189.    Plaintiff, as a stockholder and representative of CPI, seek restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

190.    Plaintiff, on behalf of CPI, has no adequate remedy at law

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of CPI, demands judgment as follows:

A.      Declaring that plaintiff may maintain this action on behalf of CPI and that plaintiff is an adequate representative of the Company;

B.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.      Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to CPI;

D.      Directing CPI to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CPI and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen CPI's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of CPI to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of CPI has an effective remedy;

F.      Awarding to CPI restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: October 26, 2020

By: _s/Benjamin I. Sachs-Michaels___
**GLANCY PRONGAY & MURRAY LLP**
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

*Counsel for Plaintiff Keith Moulton*

### <u>CPI AEROSTRUCTURES, INC. VERIFICATION</u>

I, Keith Moulton, hereby verify that I am familiar with the allegations in the Verified

Amended Shareholder Derivative Complaint (the "Amended Complaint"), and that I have

authorized the filing of the Amended Complaint, and that the foregoing is true and correct to

the best of my knowledge, information, and belief.

Date: ___10/20/2020___

DocuSigned by:

_Keith J. Moulton_
FDCC944E6863484

Keith Moulton